**JUDGE LYNCH**

Daniel H. Weiner (DW 6140)
David G. Liston (DL 2348)
Melissa R. Chernofsky (MC 9673)
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, NY 10004
(212) 837-6000



Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ADNAN ABOU AYYASH,<br><br>Plaintiff,<br><br>v.<br><br>BANK AL-MADINA, UNITED CREDIT BANK, RANA ABDELRAHIM KOLEILAT, TAHA ABDELRAHIM KOLEILAT, BASSEL ABDELRAHIM KOLEILAT, RENE MOAWAD, JOUMANA MOHAMAD AYYAS and JOHN DOES 1-10,<br><br>Defendants. | ___ Civ. _____<br><br>**COMPLAINT** |

Plaintiff Adnan Abou Ayyash ("Dr. Ayyash" or "plaintiff"), by his undersigned attorneys, brings this complaint against defendants Bank Al-Madina (the "Al-Madina Bank" or "the Bank"), United Credit Bank ("UCB"), Rana Abdelrahim Koleilat, Taha Abdelrahim Koleilat, Bassel Abdelrahim Koleilat, Rene Moawad, Joumana Mohamad Ayyas and John Does No. 1-10 (collectively, "defendants"), and alleges as follows:

## NATURE OF THE ACTION

1. This is an action for more than $1 billion in damages brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(b), (c), (d), § 1964(c) and the laws of New York State. This action involves a complex international scheme to defraud plaintiff and the other depositors of Al-Madina Bank and its sister bank, UCB, masterminded by Rana Abdelrahim Koleilat and executed by her, her family members and other officers, managers, employees and agents of the Bank.

2. Defendants' scheme unjustly enriched all the members of their conspiracy at the expense of plaintiff and the other depositors of the Bank and UCB.

3. Defendants were employees or associated with Al-Madina Bank and UCB, entities engaged in foreign commerce. Through a pattern of racketeering activity — including wire fraud, money laundering, forgery and embezzlement — defendants acquired control of the Bank and UCB, conducted their affairs through the same pattern of racketeering activity, and siphoned money from them and the accounts of their depositors.

4. Defendants conspired to acquire control and conduct the affairs of the Bank and UCB through the pattern of racketeering activity described below. Each defendant was aware of the object of the conspiracy and entered into it for his or her own personal gain. Each defendant was aware that various predicate acts would be committed to further this conspiracy.

2

5. Defendants' scheme began at least in or about November 1999, and continued until the Bank and UCB collapsed in February 2003. Had the Bank and UCB not collapsed, defendants would have likely continued their scheme.

## PARTIES

6. Dr. Adnan Abou Ayyash is the majority owner of Al-Madina Bank and UCB. He is a citizen of Lebanon and Saudi Arabia, and is currently domiciled in Saudi Arabia.

7. Defendant Al-Madina Bank is a private bank organized under Lebanese law with branches throughout Lebanon. Among other things, Al-Madina Bank derived substantial revenue from international commerce, including transactions through, with and between correspondent banks in New York.

8. Defendant UCB is a private bank organized under Lebanese law, and is an affiliate of Al-Madina Bank.

9. Defendant Rana Abdelrahim Koleilat ("Rana") was the Advisor to the General Manager of Al-Madina Bank, Ibrahim Abou Ayyash ("Ibrahim"), the minority owner of the Bank and brother of Dr. Ayyash. She is a citizen of Lebanon.

10. Defendant Taha Abdelrahim Koleilat ("Taha") is Rana's brother and a citizen of Lebanon.

11. Defendant Bassel Abdelrahim Koleilat ("Bassel") is Rana's and Taha's brother and a citizen of Lebanon.

12. Defendant Rene Moawad ("Moawad") is Rana's boyfriend and a citizen of Lebanon.

13. Defendant Joumana Mohamad Ayyas ("Ayyas") is Rana's aunt and worked as Rana's administrative assistant at Al-Madina Bank. She is a citizen of Lebanon.

14. Defendants John Does 1-10 are individuals whose identities are currently unknown to plaintiff who participated in defendants' scheme and conspiracy to defraud plaintiff and the other depositors of Al-Madina Bank and UCB, or who acted negligently in their role as officers, managers or employees of the Bank.

## JURISDICTION AND VENUE

15. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 and supplemental jurisdiction under 28 U.S.C. §1367.

16. Venue is proper in this District pursuant to 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391.

17. The Court has personal jurisdiction over defendants resulting from, among other things, their use of United States bank accounts and wire transfers of funds through New York as an integral part of their scheme and conspiracy to defraud plaintiff and the other depositors of Al-Madina Bank and UCB.

## FACTUAL BACKGROUND

18. Al-Madina Bank was founded in Beirut, Lebanon in 1982. In 1984, plaintiff and his brother Ibrahim purchased it.

19. Due to the conspiracy and scheme perpetrated by defendants as detailed below, Al-Madina Bank and UCB collapsed in February 2003.

4

Defendants' Scheme

20. Rana masterminded defendants' scheme to defraud plaintiff and the other depositors of Al-Madina Bank and UCB. She is the ringleader of a corrupt enterprise including her brothers Bassel and Taha, her boyfriend Moawad, her aunt Ayyas and other officers, managers and employees at Al-Madina Bank, who conspired through the repeated use of wire fraud, money laundering, forgery and embezzlement, to defraud plaintiff and the other depositors of Al-Madina Bank and UCB, and used United States bank accounts and wire transfers of funds through New York to do so.

21. In 1985, Rana joined Al-Madina Bank as a secretary to Ibrahim, its General Manager. She quickly became a trusted employee of the Bank.

22. Over the years, Rana rose through the ranks of Al-Madina Bank to become Advisor to the General Manager, and an officer of the Bank. Because plaintiff was not domiciled in Lebanon, and focused his time and attention on his engineering business in Saudi Arabia and elsewhere, he depended on the management of Al-Madina Bank in Lebanon to properly carry out its day-to-day activities and operations. Rana was one of the primary officials at Al-Madina Bank whom plaintiff trusted to manage its affairs.

23. Rana enjoyed unfettered access to all financial and operational information at Al-Madina Bank, including information relating to the accounts of plaintiff and other depositors of Al-Madina Bank and UCB.

24. Rana knew how to use the Bank's internal and external systems to transfer funds from one account to another, or out of the Bank altogether.

25. Rana took advantage of plaintiff's trust through a complex web of fraud designed to siphon large amounts of money from plaintiff and other depositors of Al-Madina Bank and UCB to herself and her associates.

26. As the Bank official serving as the hub of communications among plaintiff, Al-Madina Bank and the Central Bank of Lebanon (the "Central Bank"), Rana was in a unique position to execute defendants' scheme and conspiracy.

The Forgeries

27. Among other things, defendants' scheme and conspiracy included a series of forgeries designed to dupe plaintiff into transferring huge amounts of money to Al-Madina Bank, which Rana then diverted to herself and her associates.

28. Commencing in or about November 2002, Rana executed a series of forgeries, each designed to have plaintiff transfer funds to Al-Madina Bank, which Rana then diverted into a "dummy" account. Ayyas and others assisted Rana, in these forgeries.

29. The first such forgery presently known to plaintiff is a letter dated November 4, 2002 to plaintiff, purportedly from the Governor of the Central Bank, approving an increase in the capital of Al-Madina Bank to 250 billion Lebanese pounds (approximately US $165 million). This purported increase in capital and corresponding support loan from the Central Bank required a transfer by plaintiff of the same amount to Al-Madina Bank's account at the Central Bank.

30. Unaware of this forgery, plaintiff duly transferred an initial $100 million to Al-Madina Bank for the purpose of increasing its capital. Plaintiff transferred this

6

money to account number 69911, which he believed to be his personal account at the Bank. In fact, that account was a "dummy" account set up by Rana.

31. Plaintiff had been unwittingly transferring money into this account since in or around November 1999. By November 2002, he had transferred approximately $670 million to that account.

32. After receiving what he believed to be approval from the Central Bank for his request to increase the capital of the Bank, plaintiff sought to merge Al-Madina Bank with its sister bank, UCB. On or about November 18, 2002, plaintiff sent a letter to the Central Bank seeking permission to do so.

33. On or about November 20, 2002 — before the Board of the Central Bank had even considered plaintiff's request to merge Al-Madina Bank and UCB — Rana falsely informed plaintiff that the Central Bank had approved the merger between those two banks. Rana also forged a letter from the Governor of the Central Bank, dated November 25, 2002, informing plaintiff that, as part of the Central Bank's approval for the proposed merger, plaintiff was required to transfer $200 million to Al-Madina Bank's account at the Central Bank by the end of the month.

34. Rana forged a follow-up letter dated December 9, 2002, informing plaintiff that, if he did not transfer $200 million to the Al-Madina Bank account, the Central Bank's support loan would be withdrawn.

35. During this period, plaintiff requested that Rana negotiate with the Central Bank to allow him to transfer $150 million, instead of the $200 million purportedly requested. Plaintiff made those transfers as follows: (1) $20 million on

7

November 29, 2002 from UBS Bank-Zurich; (2) $80 million on December 12, 2002 from UBS Bank-Zurich; (3) $25 million on January 8, 2003 from Credit Agricole, Geneva, and (4) $25 million on January 8, 2003 from UBS Bank-Geneva.

36. At least one of these transfers was made through the Federal Reserve Bank in New York.

37. Plaintiff transferred a total of $150 million to Al-Madina Bank for the purpose of remittance to the Central Bank, and an additional $100 million to his personal account, all of which he later discovered had been wrongfully diverted by Rana for the benefit of herself and her associates.

Wire Fraud

38. As part of their scheme and conspiracy to siphon funds from plaintiff and the other depositors of Al-Madina Bank and UCB, defendants used wire transfers through and to accounts in the United States in violation of 18 U.S.C. § 1343.

39. Thus, for example, on or about October 15, 2002, Moawad ordered the transfer of $1 million from his account at UCB, account number 75344, to his account with Banque Safra France, account number 101WA274151-000, through correspondent bank Wachovia Bank, International Branch, New York, New York for further deposit with UBS AG in Stamford, Connecticut.

40. On or about October 18, 2002, Moawad ordered the transfer of $500,000 from his account at UCB to his account at EDF Man International, Inc., account number 893-89309, through correspondent bank Wachovia Bank, International Branch,

8

New York for further deposit with Chase Manhattan Bank, One Chase Manhattan Plaza, New York, New York.

41. On or about October 21, 2002, Moawad ordered the transfer of $560,000 from his account at UCB to his account with Ferrier Lullin N Cie SA, account number 83680, through correspondent bank Wachovia Bank, International Branch, New York, New York for further deposit with UBS AG in Stamford, Connecticut.

42. Upon information and belief, defendants embezzled from plaintiff and the other depositors of Al-Madina Bank and UCB the funds that Moawad transferred to these accounts in New York and Stamford, Connecticut.

43. Defendants transferred funds belonging to plaintiff and the other depositors of Al-Madina Bank and UCB to accounts in New York and Stamford for purposes of perpetuating their fraud. On information and belief, the transactions described in paragraphs 39 - 41 are representative of similar transactions used by defendants to carry out their scheme of wire fraud, money laundering, forgery, credit card fraud and embezzlement.

Money Laundering

44. As part of their scheme and conspiracy, defendants committed multiple acts of money laundering in violation of 10 U.S.C. § 1956(a)(2)(A).

45. The wire transfers described above constituted transfers of funds from outside the United States to within the United States, made with the intent to promote the carrying on of unlawful activity, *i.e.*, the defrauding of the foreign banks Al-Madina Bank and UCB.

9

46.     Defendants used their web of international wire transfers to siphon money first from "dummy" accounts at Al-Madina Bank and UCB to their personal accounts, and then from their personal accounts around the world to segregate it further from Al-Madina Bank and UCB.

47.     The web of fraudulent wire transfers critical to defendants' embezzlement and fraud also promoted further unlawful activity, namely providing material support to international terrorist organizations.

48.     Former officials of Al-Madina Bank have stated that Rana gave at least $3.5 million to "Al-Shaheed," a front organization for Hezbollah, the well-known terrorist organization. Rana came from a humble background, and received a modest salary throughout her tenure at Al-Madina Bank. On information and belief, the source of Rana's donation to the Al-Shaheed organization was the money she embezzled from plaintiff and the other depositors of Al-Madina Bank and UCB.

49.     In addition to money laundering through the United States, Rana and other members of the conspiracy laundered money through Al-Madina Bank for the benefit of the Central Bank of Iraq.

50.     In or about late 2001 through in or about early 2002, Rana and the Audit Manager of Al-Madina Bank set up a banking relationship with the Central Bank of Iraq, which was operated contrary to acceptable banking practices. This relationship was set up without plaintiff's knowledge or consent.

51.     The Central Bank of Iraq opened an account with Al-Madina Bank with the following parameters: (a) cash deposits; (b) concealing the identity of Iraq as payor

to any third party; (c) utilizing only Lebanese and Jordanian banks for wire transfers; and (d) avoiding the use of any international clearinghouses, specifically the United States.

52. By committing the acts described above, Rana and her co-conspirators conducted the affairs of Al-Madina Bank and UCB through a pattern of racketeering activity. Defendants took *de facto* control of the bank through this corrupt activity.

## The Bank's Collapse and the Final Fraud

53. Defendants and their corrupt enterprise caused the collapse of Al-Madina Bank and UCB in February 2003.

54. During the period between in or about December 2002 through January 2003, Rana issued more than 400 checks in her name and the names of the other participants in defendants' conspiracy, for a total of $150 million, in an attempt to withdraw the remaining balance of suspected laundered money from Al-Madina Bank and UCB. These checks caused a liquidity crisis and the subsequent collapse of Al-Madina Bank and UCB.

55. Plaintiff infused $470 million of his own funds into Al-Madina Bank and UCB in an effort to avert the liquidity crisis and pending collapse caused by Rana and her enterprise. Plaintiff never recovered these funds.

56. Plaintiff was taken completely by surprise when Al-Madina Bank and UCB collapsed.

57. Immediately after the collapse and loss of hundreds of millions of dollars of funds belonging to plaintiff and the other depositors at Al-Madina Bank and UCB,

plaintiff informed Rana that he would institute legal proceedings against Rana and her family if she did not immediately return the stolen funds.

58.     Rana convinced plaintiff she would return his money, and informed him that she maintained an account at Credit Agricole-Indosuez, Switzerland, containing more than $4 billion. Rana informed plaintiff that she was willing to transfer the account to plaintiff if he would give her checks for the balance of her account minus the amount she owed him.

59.     Rana then assigned this purported Swiss bank account to plaintiff by means of an official "deed of cessation" attested to by a notary public. She also put plaintiff in touch with individuals in Switzerland to verify the purported transaction to plaintiff.

60.     Plaintiff then made out checks to Rana for the difference between the amount she had taken from plaintiff and the other depositors of Al-Madina Bank and UCB and the amount supposedly in Rana's Credit Agricole-Indosuez account. After weeks of inquiry, plaintiff discovered that Rana's purported bank account at Credit Agricole-Indosuez did not exist, and Rana had forged the documents she provided to plaintiff. Rana used plaintiff's checks to pay off some of her own debts, in particular providing the Central Bank with a check for 310 million euros drawn on the Arab Bank in Paris.

## COUNT I:  RACKETEERING ACTS (Against All Defendants)

61.     Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 – 60 as though set forth fully herein.

62.     Defendants formed a corrupt enterprise whose purpose was to defraud plaintiff and the other depositors of Al-Madina Bank and UCB.

63.     Rana was the hub of this enterprise, and the other defendants were its spokes, each important in managing the complex web of fraud and embezzlement.

64.     The members of the enterprise were all family members, close friends or co-workers of Rana, and were associated in fact through their relationships with her, as well as their participation in the conspiracy.

65.     Each defendant was aware of the nature of the group's conspiracy, and willingly and knowingly participated with the motive of obtaining his or her own personal financial gain.

66.     Defendants conducted the affairs of the Al-Madina Bank and UCB through a pattern of corrupt activity, including wire fraud and money laundering, all for the purpose of defrauding plaintiff and the other depositors of the Al-Madina Bank and UCB.

67.     Through this pattern of racketeering activity, defendants gained control of Al-Madina Bank and UCB.

68.     This pattern of racketeering activity injured plaintiff and the other depositors of the Al-Madina Bank and UCB.

A.     <u>WIRE FRAUD</u>

69.     Defendants engaged in a scheme and conspiracy to defraud plaintiff and the other depositors of the Al-Madina Bank and UCB.

70. Defendants knowingly and intentionally participated in the acts described above intending to defraud plaintiff and the other depositors of the Al-Madina Bank and UCB.

71. In furtherance of this scheme to defraud, defendants used both international and interstate wire transfers.

72. The wire transfers detailed above are believed to be only a few of the many used by defendants in their corrupt scheme.

73. Each wire transfer described above is a separate predicate act under RICO, and part of the pattern of defendants' corrupt activity.

B.  MONEY LAUNDERING

74. As part of their scheme and conspiracy to defraud plaintiff and the other depositors of the Al-Madina Bank and UCB, defendants transferred money into the United States from outside the United States.

75. Defendants transferred this money with the intent of promoting unlawful activity.

76. As outlined above, this unlawful activity included the defrauding of the foreign banks Al-Madina Bank and UCB, and providing material support to terrorist organizations.

## COUNT II: CONSPIRACY TO VIOLATE RICO (Against All Defendants)

77. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 – 76 as though set forth fully herein.

14

78. Defendants knowingly conspired to form the corrupt enterprise described above.

79. Each defendant was aware of the purpose of the group's conspiracy, namely to defraud plaintiff and the other depositors of the Al-Madina Bank and UCB.

80. Each defendant committed acts in furtherance of the conspiracy, as described above.

### COUNT III: FRAUD (Against All Defendants)

81. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 - 80 as though set forth fully herein.

82. The letters forged by Rana, with the assistance of Ayyas and others, constitute misrepresentations to plaintiff.

83. Plaintiff reasonably relied on defendants' misrepresentations regarding the transfer of funds purportedly required to accomplish transactions involving Al-Madina Bank and UCB.

84. Due to these misrepresentations, plaintiff transferred at least $250 million to accounts later converted by Rana for her own benefit and that of her associates.

85. These actions constitute common law fraud.

### COUNT IV: CONVERSION (Against Rana Koleilat and John Does 1-10)

86. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 - 85 as though set forth fully herein.

87. Rana knew that the funds she transferred from plaintiff's account and the accounts of other depositors of Al-Madina Bank and UCB belonged to plaintiff and the other depositors of the Al-Madina Bank and UCB.

88. Rana transferred these funds to her own personal account or the accounts of her associates, thereby converting them.

89. Rana was not authorized to transfer these funds to her personal account or the accounts of her associates, and did so to the exclusion of plaintiff's rights and the rights of the other depositors of the Al-Madina Bank and UCB to those funds.

90. These actions constitute the common law tort of conversion.

### COUNT V: BREACH OF FIDUCIARY DUTY
### (Against Rana Koleilat, Joumana Ayyas and John Does 1-10)

91. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 – 90 as though set forth fully herein.

92. Rana was a trusted advisor to plaintiff and his brother, as well as an officer of Al-Madina Bank.

93. As officers, managers or employees of Al-Madina Bank, Rana, Ayyas and John Does 1-10 owed duties of loyalty and care to plaintiff and the other depositors of the Al-Madina Bank and UCB to protect their interests.

94. Rana, Ayyas and John Does 1-10 breached these duties by embezzling money from plaintiff and other depositors of the Al-Madina Bank and UCB.

95. Rana further breached these duties by triggering a liquidity crisis at Al-Madina Bank and UCB, which led to their subsequent collapse.

## COUNT VI: NEGLIGENCE (Against Rana Koleilat, Joumana Ayyas and John Does 1-10)

96. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 – 95 as though set forth fully herein.

97. Rana, Ayyas and John Does 1-10 each owed a duty to plaintiff and the other depositors of the Al-Madina Bank and UCB to act professionally and fulfill his or her responsibilities as officers, managers or employees of the Bank. These duties included the duty to properly supervise Bank officers, managers and employees.

98. By failing in their duties, Rana, Ayyas and John Does 1-10 each allowed the fraud orchestrated by Rana and executed by the named individuals described, and the subsequent collapse of Al-Madina Bank and UCB.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

(i) On Count I, awarding plaintiff damages against all defendants in an amount to be determined at trial. Plaintiff also seeks treble damages, costs and expenses incurred in this litigation and reasonable attorneys' fees to the extent allowed by law;

(ii) On Count II, awarding plaintiff damages against all defendants in an amount to be determined at trial. Plaintiff also seeks treble damages, costs and expenses incurred in this litigation and reasonable attorneys' fees to the extent allowed by law;

(iii) On Count III, awarding plaintiff damages against all defendants in an amount to be determined at trial. Plaintiff also seeks costs and expenses incurred in this litigation and reasonable attorneys' fees to the extent allowed by law;

(iv) On Count IV, awarding plaintiff damages against Rana Koleilat and John Does 1-10 in an amount to be determined at trial. Plaintiff also seeks costs and expenses incurred in this litigation and reasonable attorneys' fees to the extent allowed by law;

(v) On Count V, awarding plaintiff damages against Rana Koleilat, Joumana Ayyas and John Does 1-10 in an amount to be determined at trial. Plaintiff also seeks costs and expenses incurred in this litigation and reasonable attorneys' fees to the extent allowed by law;

(vi) On Count VI, awarding plaintiff damages against Rana Koleilat, Joumana Ayyas and John Does 1-10 in an amount to be determined at trial. Plaintiff also seeks costs and expenses incurred in this litigation and reasonable attorneys' fees to the extent allowed by law; and

(vii) Such other and further relief as the Court deems just and proper.

Dated: New York, New York
November 19, 2004

HUGHES HUBBARD & REED LLP

By: *[signature]*
Daniel H. Weiner (DW 6140)
David G. Liston (DL 2348)
Melissa R. Chernofsky (MC 9673)
One Battery Park Plaza
New York, NY 10004
(212) 837-6000

Attorneys for Plaintiff

NY-891322_1.DOC