# PRELIMINARY REPORT

## AL-MADINA BANK SCANDAL



## CONFIDENTIAL

# TABLE OF CONTENTS

Exhibit Listing     3

Executive Summary     4

- Money Laundering Involving the Central Bank of Iraq     5
- Syrian Military and Political Corruption     5
- Possible Corruption at the High Levels of the Lebanese Government     6
- Repeated Violations of Lebanese Banking Regulations     6
- Violations of United States Law     7
- Massive Theft and Money Laundering Conspiracy by Rana Koleilat, Who Through a Partner Bribery and Intimidation Co-Opted Several Other Employees to Participate In Her Crime     8
- Rana Koleilat's $3.5 Million Donation to "Al-Shaheed," a Political Front for "Hezbollah", a Known Terrorist Organization     8
- The Immense Financial Loss and Tarnishing of the Impeccable Reputation of Ayyash     9
- Confidential Sources     9
- Conclusion     10

Details of the Al-Madina Bank Scandal     11

Exhibits     Exhibits

## EXHIBITS

| | |
|---|---|
| Exhibit A | Lebanon Bill of Indictment- Rana Koleilat, Joumana Mohamad Ayyas |
| Exhibit B | List of Transfers To Bank Al-Madina, Dr. Adnan Abou Ayyash |
| Exhibit C | Al-Madina Credit Card Activity, Ghazali Family |
| Exhibit D | Press Release- United States Attorney's Office Southern District of New York – Mention of Al-Madina Bank Money Laundering |
| Exhibit E | Syrian Minister of Defense and Deputy Prime Minister of Syria, Mostapha Tlass - Original in Arabic and English Translation |
| Exhibit F | US Jurisdiction |
| Exhibit G | Forged Signature - Governor Riad Salameh Letter and Documentation Re: Transfer of Dr. Adnan Abou Ayyash |
| Exhibit H | Legal Documents Re: Rana Koleilat Forgeries and Money Transfers of Dr. Adnan Abou Ayyash |
| Exhibit I | HSBC London (Fake Swift) Forged Documents |
| Exhibit J | Ahlam Residence in Beirut Relating to Khaled Kaddour |
| Exhibit K | Documents Re: Elias Muir Residence in Beirut |
| Exhibit L | Correspondence Between Central Bank of Iraq and Bank Al-Madina – Original in Arabic with English Translation |
| Exhibit M | Sampling Lawsuits Filed in Beirut on Behalf of Dr. Adnan Abou Ayyash |
| Exhibit N | Lebanese Money Laundering Law – Law # 318/2001 |
| Exhibit O | Chart Showing Overview of the Al-Madina Bank Scandal |

## EXECUTIVE SUMMARY

The following is a preliminary report prepared by Fortress Global Investigations, an international investigations company. Fortress Global Investigations, at the request of a client, initiated an investigation into the collapse and handling of the investigation by the Lebanese authorities.

This matter deals with the collapse of the Bank Al-Madina ("Al-Madina", "The Bank") and its sister bank United Credit Bank ("UCB") in Beirut, Lebanon in 2003. Lebanon is an extremely large banking sector with deposits of roughly $40 billion in more than seventy private banks.

The loss, which could total as much as $2 billion or more, is staggering even in the world of high finance. The Chairman/General Manager of the Bank, Dr. Adnan Abou Ayyash ("Ayyash", "Dr. Adnan"), who is also the majority owner of the two banks, lost over $1.2 billion of his personal wealth and has had real property seized by Lebanese authorities amounting to approximately $450 million in Lebanon and France.

In February 2003, the Central Bank Governor, Riad Salameh ("Salameh"), authorized Prosecutor General Adnan Addoum of Beirut to conduct an investigation into the Bank's collapse. Although this led to the arrest of nine bank officials, Addoum abruptly ended the probe after only one month and sealed the records of the Bank without offering an explanation. In July 2003, Salameh authorized Addoum to conduct a money laundering investigation. (See Exhibit N). In September 2003, the Central Bank of Lebanon called back the money laundering file from the offices of Addoum and the file remains dormant there to date. On September 8, 2003, the Prosecutor General suddenly announced the judiciary was ending its probe of the two banks. Several letters were sent by Ayyash's lawyers to the Central Bank and the Prosecutor General requesting that the money laundering case be re-opened. These letters remain unanswered to date.

The results of investigation set forth in this report decry the incredulity of the decision to close the investigation. They include:

## I.     Money Laundering Involving The Central Bank of Iraq

Of particular note and concern is the apparently illegal banking relationship between The Central Bank of Iraq and the Bank Al-Madina. Letters from both institutions were exchanged in late 2001 and early 2002 to formalize The Central Bank of Iraq opening an account at Al-Madina. The parameters set by The Central Bank of Iraq are as follows:

- Cash deposits.
- Concealing the identity of Iraq as a payor to any third party.
- Utilization of only Lebanese and Jordanian banks for wire transfers.
- Avoidance of any international clearing houses, specifically the United States.

The Bank Al-Madina letter agreeing to the terms set forth by the Central Bank of Iraq was signed by Rana Koleilat ("Koleilat", "Rana"), an officer of Al-Madina and a prime mover in the collapse of the bank, and Vincent Zreikah, the auditing manager, which is an obvious conflict. The terms agreed to in this letter are contrary to banking regulations, violate anti-money laundering regulations, conflict of interest rules and cry out for a money laundering probe by authorities.

Transcripts of the actual letters between the two banks are provided as exhibits (See Exhibit L).

## II.     Syrian Military and Political Corruption

Master Card credit cards for Al-Madina were issued by Rana Koleilat to the brothers of General Rustum Ghazali, Chief of Military Intelligence. Multiple maximum daily withdrawals were made in the amount of $2,000 for each card from December 16, 2002 to January 15, 2003 totaled as follows:

Mohamad Ghazali - $342,819.90

Mohammed Al Ghazali (same as above) - $198,239.00

Burhan Ghazali - $200,017.80

Dr. Nazem Ghazali - $199,936.60

The total amount of the charges, which were illegally paid by Koleilat from bank funds was $941,013.30.  Because Mohamad Ghazali had two credit cards under variations of spelling of his name, the question arises as to if General Ghazali used one of these cards. See credit card statements (See Exhibit C).

In November 2002, Koleilat moved $100,015.00 through the UCB account of Hamieh Ihab Abdelrahman, a currency exchanger, to the Blom Bank account of Mostapha Tlass. Tlass is the Minister of Defense and the Deputy Prime Minster of Syria.  See Debit Advice from the UCB (See Exhibit E).

Koleilat turned over possession of a luxurious $2.5 million apartment in the Ahlam section of Beirut to Waell Abed Razik Ameir, a close personal friend of Kalid Kaddour, the office manager of Lieutenant Colonel Maher Al Assad, the brother of President Assad of Syria.  (See Exhibit J).

### III.    Possible Corruption at the High Levels of the Lebanese Government

Koleilat bought a villa in the name of her boyfriend, Rene Moawad, from Elias Muir, Minister of Interior Affairs of Lebanon and the son-in-law of Lebanese President Emile Lahoud.  Koleilat paid $10 million for the apartment but during the liquidity crisis at Al-Madina, Moawad turned the villa over to the Central Bank and it had a value of $2.5 million.  At the minimum, this transaction has the appearance of impropriety, noting the $7.5 million dollar difference between the amount paid and the actual value.

### IV.    Repeated Violations of Lebanese Banking Regulations

During the period from the fall of 2000 to the winter of 2003, audits conducted by the Banking Central Commission (BCC), Deloitte & Touche and others showed evidence of questionable banking practices at Al-Madina including the following:

- Forged bank statements

- Concealing foreign currency positions
- Double accounting
- Difficulty in confirming account balances at foreign banks
- Suspicion of money laundering

## V.    Violation of United States Law

Evidence as outlined below has been uncovered of various potential violations of US criminal statutes.

On October 18, 2002, Rene Moawad, boyfriend of Rana Koleilat, ordered the transfer from his account at the UCB, Beirut $500,000.00 to his account at ED Man International, Inc. a segregated fund, account number 893-89309 through correspondent bank, Wachovia Bank, New York International Branch for further deposit into Chase Manhattan Bank, 1 Chase Plaza, New York, NY 10005, ABA number 021000021, Chips universal ID 279842.  Information was received that Rene Moawad has a history in Beirut for bank fraud.

On 10/21/02, Moawad ordered the transfer from his account with UCB $560,000 to his account with Ferrier Lullin N Cie SA, account number 83680, through correspondent bank Wachovia Bank NA International Branch, New York, NY for further deposit into UBS AG Stamford, CT, US.  Account BIC UBSW US 33.

On 10/15/02, Moawad ordered transfer from his account at UCM $1 million to his account 75344 with Banque Safra France 101WA274151-000 through correspondent bank Wachovia Bank International Branch, New York, NY for further deposit with UBS AG Stamford, CT, US, account BIC UBS W US33.  See Exhibit F regarding the above.

The Bank Al-Madina, according to Koleilat was purported to have $400 million on account with a Bankers Trust/Deutsche Bank, a correspondent bank in New York. Reportedly, the Central Bank sent an investigator to Bankers Trust, among other things,

presumably to verify the existence of the account, the results of which are unknown at this time.

This matter has been discussed with the Federal Bureau of Investigations ("FBI") in New York so that they could present a portion of it to obtain a prosecutorial opinion from the United States Attorney's Office for the Southern District of New York. The documents concerning possible jurisdiction are discussed in detail and are in the Exhibit section of this report.

## VI.    Massive Theft and Money Laundering Conspiracy by Rana Koleilat, who Through a Partner Bribery and Intimidation Co-Opted Several Other Employees to Participate in Her Crimes.

The entire senior staff at Bank Al-Madina was arrested during the initial investigation by the Beirut authorities. Further, Ayyash, to date, has had the assets of Koleilat, her family and associates frozen by his attorneys and they are the subject of almost 100 lawsuits and have a value of approximately $80-100 million.   Koleilat, at one time, had almost $310 million in loans from the Bank with no collateral and through a fictitious account in the name of Ayyash, stole $750 million plus. Rana Koleilat has been charged with forging the signature of the Governor of the Central Bank, Riad Salameh. Taha Koleilat, brother of Rana, has been the subject of money laundering inquiries in Beirut, which led to Belgian authorities freezing his assets in Beirut.

## VII.    Rana Koleilat's $3.5 Million Donation to "Al-Shaheed", A Political Front for "Hezbollah", a Known Terrorist Organization.

Former Bank officials have stated that Koleilat gave $3.5 million to this front organization of Hezbollah. These officials stated that documentation in available and they are in the process of obtaining it.

For information, during June of 2004 the US Attorneys Office, New York, NY, announced that an individual had been charged with furnishing night vision goggles, infrared aiming devices and other military night vision equipment to Hezbollah, a

Lebanon based terrorist organization. During this investigation, this individual was recorded stating he traveled all over the world collecting money which was then laundered Bank Al-Madina in Beirut. (See Exhibit D).

## VIII.  The Immense Financial Loss and Tarnishing of the Impeccable Reputation of Ayyash.

During the period November 1999 through March 2003, Dr. Adnan Abou Ayyash transferred a total of $785 Million from his personal wealth to his Al-Madina Bank account number 69911. (See Exhibit B). This was a non-existent account at Al-Madina Bank that was controlled by Ran Koleilat. All of these monies were stolen from Dr. Adnan Abou Ayyash's account and deposited into Koleilat's relatives and associates accounts. Rana then moved the money out of these accounts. When the Bank was experiencing a liquidity crisis Ayyash again transferred $470 Million of his own money into the Bank to cover the accounts of depositors.

## IX.    Confidential Sources

Confidential sources in a position to know received first hand information regarding the following:

- Mawar Iskandar was told by Riad Salameh that if Salameh opened a case on the Al-Madina Bank he would be killed by the Syrians.

- Michele Hahov, attorney for the Al-Madina Bank, was told by Salameh that if Salameh opens a case it will be a death knell to the political in Lebanon.

- In March 2003 Rana Kaleitat went to the Al-Madina Bank account department for $300,000 for a donation to General Rustman Ghazali, current Chief of Syrian Military Intelligence. When Central Bank learned of this, Riad Salameh, the Governor of the Central Bank was advised. When he called, the money had already left for Ghazali. During a conference call with the Al-Madina Bank Salameh said this donation could not be done so they should put it in a profit and loss account.

- Rashid Najjar, Deputy General Manager, said that Rana Koleilat thorough Rene Moawad had arranged for $5 Million to be sent to Al-Madina from the Central

Bank of Iraq.   This was arranged through Ouday Hussein, the late son of Saddam Hussein.   It was common knowledge at the Bank that Rene Moawad was a good friend of Ouday.

## X.    Conclusion

One can only surmise that if the bank records were made available and the matter thoroughly investigated, it would have a severe negative impact on the financial credibility and integrity of the Lebanese and Middle East banking systems and expose corruption among high ranking government and banking officials.   Details and supporting documents of the above charges are in the Details and Exhibit sections of this report.

The actions of the Central Bank, the Higher Banking authority, raise questions as to their professional judgment and motives.   The Banking Control Commission ("BCC") had expressed in numerous official communications with the Central Bank many doubts and serious concerns about the Bank.   Their audit team concluded that statements provided by the Bank were falsified and involved two sets of books, or double accounting, being practiced at the Bank.   This surfaced in late 2000 and early 2001.   A new external auditor, Deloitte & Touche, was appointed and they continually discovered violations of banking regulations, non-compliance with regulations, and unclear banking operations.   The BCC suggested the appointment of a new general manager.   Through the fall of 2002, Rana Koleilat, mentioned above, forged letters to and from the Central Bank and the Bank Al-Madina falsely confirming that these issues were rectified.

The question must be answered as to why the Central Bank permitted this unprofessional, unethical and apparently criminal conduct to continue operating without scheduling follow up and proper regulatory oversight based on the findings and recommendations of the audit teams.

In conclusion, it is clear that a proper oversight body such as GAFI/FATF should at the very minimum investigate these charges and facilitate the release of the Bank's records currently being withheld.

## DETAILS OF THE AL-MADINA BANK SCANDAL

In 1984, Dr. Adnan Abou Ayyash, a Ph.D. in civil engineering and a resident of Saudi Arabia, had amassed a respectable wealth in the consulting and construction of prestigious engineering projects all over Saudi Arabia, Europe and North Africa. He decided to invest some of his hard earned monies in his home country Lebanon. Dr. Adnan bought a controlling interest in Bank Al-Madina, a local Lebanese bank, but relegated the management of the bank to his brother Ibrahim Abou Ayyash ("Ibrahim"). Dr. Adnan remained in Saudi Arabia to run his consulting / engineering business.

In 1998, Bank Al-Madina acquired the license of two other non-active banks, "Foreign Trade Bank" and "Commercial Facilities Bank." These two banks were later merged into "United Credit Bank", a sister bank to Bank Al-Madina. During the years, Bank Al-Madina's operations developed considerably and in less than fifteen (15) years the bank had opened more than twenty-two (22) branches in Lebanon. At the same time, the Lebanese business operations of the Abou Ayyash family (Dr. Adnan and his brother) were also expanding in other industries through the Madina Group. This group was a conglomerate of many companies in various industries such as insurance, real estate, beach and hotel resorts, pharmaceuticals, food and beverage, etc. The Madina Group and Bank Al-Madina together employed more than twelve hundred (1200) employees.

As we know now an officer of the bank, Rana Koleilat, was a prime mover in an elaborate fraud conspiracy involving money laundering and the defalcation of billions of

dollars. Koleilat is currently in a Beirut jail for numerous criminal violations of Lebanese law relating to this bank collapse during February 2003.

Koleilat was employed by Bank Al-Madina in 1985 as a secretary to the General Manager, Mr. Ibrahim Abou Ayyash. She steadily worked her way up and gained the confidence of the Abou Ayyash brothers as well as the other officers at the bank. Due to the fact that Dr. Adnan was residing in Saudi Arabia and Koleilat was an advisor to Ibrahim, she became a knowledgeable insider as to the operations of the bank as well as the personal / banking matters of the Abou Ayyash brothers. It is noted that unbeknownst to Dr. Adnan, Koleilat opened a fictitious bank account (bank account # 00069911) for Dr. Adnan so that he could build up the assets of the bank due to expansion plans of the bank and for improving liquidity. (See Exhibit B). Dr. Adnan transferred over $750 Million to this fictitious account which has been completely lost. Koleilat converted this money to her own use and executed her massive conspiracy on two fronts, internally at the bank with the help of many key officials and externally with the help of her two brothers, Taha and Bassel and other family members. Additionally, she was assisted by her close personal friend, Rene Moawad. It is noted that the following bank officials have been arrested and charged in Lebanon relating to this conspiracy:

- Ibrahim Abou Ayyash – Chairman, General Manager
- Youssef El Hishi – Accounting Manager
- Kazem Bahlwah – IT Manager
- Iman Daher – Main Branch Manager
- Joumana Abed Al Baki - International and Swift Manager
- Rana Kolayake (*sic*) – Advisor for General Manager
- Rashid Al Nazzar – Advisor for General Manager

- Walid Nassif – Deputy General Manager
- Wael Abu Shakra – External Auditor

Evidence shows that Koleilat consistently and methodically would buy these officials valuable gifts such as luxurious apartments and cars. She used these bribes against them to guarantee their silence. She claimed she was backed by high ranking government officials and army intelligence officials both locally and regionally and enjoyed their total support. To cover the money that she was amassing, noting her humble beginnings and modest salary at the bank, she claimed that her uncle was an extremely wealthy Egyptian general who was sending money to her family for caring for his impaired son.

It is noted that to date, Dr. Adnan has filed some 100 lawsuits freezing $80 - $100 Million of real property connected to Koleilat's scheme to collapse or "bust out" the bank. (See Exhibit M).

The fraudulent activities were varied and extensive. They included forgery, document fabrication and fraud.

As mentioned above, at the insistence of Koleilat and largely under false pretense, Dr. Adnan was regularly sending money transfers to his personal account (bank account # 00069911) at Bank Al-Madina from his bank accounts in Saudi Arabia and Switzerland. Koleilat would convince him that the transfers were badly needed either in order to enhance the bank's liquidity or to increase the bank capital in preparation for its expansion and upcoming merger for the two sister banks. In continuance of this fraud,

13
*Confidential*

she faxed   him several letters and communications between Bank Al-Madina and the Central Bank of Lebanon in which the Central Bank agreed to the merger of the two sister banks, Bank Al-Madina and United Credit Bank, and to the capital increase provided that Dr. Adnan transfer $180 Million into Bank Al-Madina. As outlined in Exhibit A, these letters were recently found to have been forged by her and are currently the subject of a lawsuit brought by the Central Bank Governor, Riad Salameh. (See Exhibit A).

The two above forged documents sent to Bank Al-Madina (forwarded to Dr. Adnan Abou Ayyash) from the Central Bank of Lebanon called for substantial monies (over $350 Million) to be infused into Bank Al-Madina to allow the merger to occur and to increase Bank Al-Madina's capital. The exhibit mentioned above which documents the transfer of Dr. Adnan's funds to Bank Al-Madina once again shows the personal funds that he lost at the manipulative and criminal hands of Koleilat.

Another example of her forgeries / fraud was the HSBC account, account number 229965 / 239965, in London, England in her name. The bank collapse occurred in February 2003. Dr. Adnan, in an attempt to recover some of his money and money for depositors affected, attended a meeting in Switzerland during May 2003 with Koleilat and her boyfriend Rene Moawad. She showed a letter dated May 6, 2003 indicating that $280 million of her funds from HSBC account number 229965 to an account of Dr. Adnan in Switzerland. The wire transfer (swift) was later determined to be a fake. It is to be noted

that subsequent forged letters to HSBC London mentions account number 239965. (See Exhibit I).

In addition to stealing Dr. Adnan's savings, Koleilat was able to steal depositor's money through many bank loans she managed to get from the bank for herself, her brothers and others without any tangible backing or collateral.

It would also appear that Koleilat was involved in, at the very least, quite questionable and probably criminal practices in some cases with very prominent individuals in Lebanon, Syria and Iraq. (See Exhibit C, K & L).

She also supplied $3.5 Million dollars to Al-Shahid, a political front for the terrorist organization Hezbollah. (Evidence available upon request).

Of particular note is Koleilat's involvement with the opening of an account with the Central Bank of Iraq. On October 5, 2001, the Central Bank of Iraq opened an account with Bank Al-Madina, Lebanon to be operated contrary to acceptable banking practices in that it was agreed upon that the account would be credited as follows:

- By cash
- Transfers from Jordanian banks
- Transfers from Lebanese banks
- Transfer from outside Lebanon without going through a clearinghouse or any American bank

This agreement was signed on behalf of Bank Al-Madina by Koleilat and Vincent Zreikah, the auditory manager. Zreikah's participation in this transaction is an obvious

conflict. The signator for the Central Bank of Iraq was Hassan Khazal Hussein, acting General Manager of Investments. Records substantiating the amounts of money that went through the account in cash and transfers are currently sealed by the Banking Commission. (See agreement letter translated in English, Exhibit J).

Additionally, Koleilat was involved in a real estate transaction involving Elias Muir, the son-in-law of President Emile Lahoud of Lebanon. Muir is the Lebanese Minister of Internal Affairs. Koleilat purchased the Muir villa for $10 Million and registered it in the name of her personal friend, Rene Moawad. Due to a liquidity crisis at Bank Al-Madina, it became necessary to turn over some property in cash. Koleilat and Moawad had to turn over the property to the Central Bank. The property was valued at $2.5 Million by the Central Bank. The question arises as to the close relationship of Koleilat and Elias Muir and the $7+ Million difference between the purchase price and the Central Bank of Lebanon's value price of $2.5 Million.

Another questionable real estate transaction involving Koleilat had to do with a high Syrian official. It involved the transfer of a luxurious multi-million dollar apartment in the Ahlam district of Beirut from her to Wael Abed Razik Ameir (at no cost). Ameir is a close personal friend of Khalid Kaddoun, the office manager of Lt. Col. Maher Al Assad, the brother of President Assad of Syria. (See Exhibit J).

MasterCard credit cards for Bank Al-Madina were issued by Koleilat to the brothers of General Rustum Ghazali. Multiple maximum daily withdrawals in the amount of

$2,000.00 each with each card from December 16, 2002 to January 15, 2003 totaled as follows:

- Mohamad Ghazali - $342,849.90
- Mohammed Al-Ghazali (same as Mohamad) - $198,239.00
- Burhan Ghazali - $200,017.80
- Dr. Nazem Ghazali - $199,936.60

The total amount charged, which was improperly paid by Koleilat from bank funds was $941,013.30. Because Mohamad Ghazali has two credit cards under variations of the spelling of his name, the question arises as to if General Ghazali used one of these records. (See Exhibit C).

In November 2002, $100,015 was moved by the United Credit Bank (UCB) through the account of Hamieh Ihab Abdel Rahmna, a currency exchanger to the Blom Bank to the account of Mostapha Tlass. Tlass is the Minister of Defense and Deputy Prime Minister of Syria. These allegations, if true, show the true scandals reach to the highest levels. (See Exhibit E).

Of note is the sizable amount of money that has passed through the accounts of money exchangers, Bilal Sayegh and Ahmed Salem, in such a short period of time. For the period June 2002 through September 2002, $300 Million passed through the account of Bilal Sayegh. The Banking Commission (BCC) became suspicious and the account was closed. On September 6, 2002, the brother of Sayegh's wife, Ahmed Salem, opened a different account and during a three (3) month period until December 2002, another $200

Million passed through this account. This activity was at the Mazraa Branch of Bank Al-Madina and over $500 Million went through these accounts.

One can readily see the signs of money laundering in some of Koleilat's activities, for example:

- The Central Bank of Iraq and Al-Madina's communications
- The vast amount of money going through money exchangers accounts
- The enormous amount of monies at Koleilat's disposal
- The forgeries of official documents and swifts (wire transfers)

Triggering the collapse of the bank was another chapter in Koleilat's conspiracy. Evidence makes clear that Bank Al-Madina's collapse was orchestrated by Koleilat to bring about its liquidation in order to eradicate all possible evidence of money laundering. The liquidity crunch that led to the bank collapse was caused by hundreds of bankers checks drawn by Koleilat on her account in an attempt to withdraw the remaining balance of the suspected laundered money. Evidence confirms that During the period of December 2002 and January 2003 (up to February 5, 2003, the date of the actual collapse) she issued more than 400 checks in her name and the names of her accomplices drawn on her account for a total amount of about $150 Million. This amount was sufficient enough to create a liquidity crisis and consequently cause the bank's collapse.

When the bank collapse became a reality in February 2003, Dr. Adnan's actions show his shock and surprised at the bank's collapse. At that time, he did not realize the possibility of the bank's collapse. Two weeks earlier he received copies of the letters forged by

Koleilat from the Central Bank Governor regarding the negotiations for the merger of the two sister banks and he had transferred $150 Million to Bank Al-Madina, which was a partial payment of the amount he requested under false pretenses from Governor Riad Salameh of Central Bank. This corroborates that Dr. Adnan, unbeknownst to him, operating under false pretense had no reason to suspect the nearing collapse of Bank Al-Madina. (See Exhibit A). Another forged letter signature and false letter from Central Bank Governor Salameh required Dr. Adnan to transfer an additional $100 Million in order to increase capital. Also additional forged signatures / false letters are addressed in legal documents filed in Beirut (See Exhibits A & G).

The Credit Agricole matter caused Dr. Adnan his only current legal problems stemming from this matter. Immediately after the collapse of the two sister banks (Bank Al-Madina and United Credit Bank) and the complete loss of Dr. Adnan's savings at Bank Al-Madina amounting to $790 Million stolen by Koleilat, the additional loss of $470 Million transferred to the Central Bank and the loss of all his assets in Lebanon amounting to more than $500 Million, Dr. Adnan planned to sue Koleilat and her family if she did not return his funds and compensate his losses. Koleilat convinced Dr. Adnan that she would return his stolen money noting she had an account in Credit Agricole-Indoduez Switzerland containing more than $4.3 Billion. She was willing to transfer it to him if he would give her a check for the balance of her account minus the amount she owed him. She assigned the alleged bank account to Dr. Adnan by means of an official "deed of cessation" attested by a public notary. Further she called someone in Switzerland to verify all of the information for Dr. Adnan. The checks for the difference were then made

by Dr. Adnan. Dr. Adnan instructed his brother Ibrahim to hold the checks and not give them to Koleilat until the monies were transferred from the Credit Agricole in Switzerland. Ibrahim did not follow the instructions of Dr. Adnan and turned the checks over to Koleilat. Later, after weeks of inquiries, Dr. Adnan found out that the alleged Swiss bank account was another scam of Koleilat's and that she used some of the checks obtained from him to pay some of her debts, specifically giving one of the checks (for 310 Million Euro drawn on Arab Bank – Paris) to the Central Bank of Lebanon thereby making matters worse between Dr. Adnan and the Central Bank. In August 2003, Dr. Adnan filed a lawsuit against Koleilat and her family. Charges include stealing his money as well as depositors', embezzlement and forgery.

These matters cannot be addressed properly if the Governor of the Central Bank Riad Salameh unexplainably continues to hold the file and not authorize the Prosecutor – General to conduct a thorough money laundering investigation. Dr. Adnan wants the matter to be thoroughly and professionally investigated. Is it because the banking industry in Lebanon may be adversely affected? Is there concern of high political figures in Lebanon and other countries in the Middle East, i.e. Syria being too close to Bank Al-Madina?

The preliminary estimate of the money stolen by Rana Koleilat and her accomplices through this complex and extensive conspiracy is approaching $1.75 billion in cash. Dr. Adnan Abou Ayyash lost some $900 Million of his own money not to mention his property seized. Depositors' losses are approaching $800 Million. The real question is the

amount of money that was laundered through the bank and by whom and this can only be answered through the release of the bank records by the Central Bank and a thorough investigation by the Prosecutor – General.

With regard to the United States jurisdiction concerning this matter, the following set forth below indicates accounts of Rene Moawad from Bank Al-Madina transferring cash through correspondent banks in New York, New York apparently for accounts in the United States. On October 18, 2002, Rene Emil Moawad, the boyfriend of Rana Koleilat, ordered the transfers from his account at United Credit Bank (UCB) in Beirut, $5 Million to his account at EDF Man International Inc., as segregated funds, account # 893-89309 through correspondent bank, Wachovia Bank, New York, International branch for further deposit into Chase Manhattan Bank, 1 Chase Manhattan Plaza, New York, New York 10005 (ABA # 021000021, CHIPS Universal ID 279 842).

On October 21, 2002, Rene Moawad ordered the transfer from his account with UCB $560,000 to his account with Ferrier Lullin N CIE, SA (Account # 83680) through correspondent bank, Wachovia Bank NA, New York, International Branch, New York, New York for further deposit into UBS AG Stamford, Connecticut, US (Account BIC, UBSW US 33).

On October 15, 2002, Rene Moawad ordered the transfer from his account with UCB, $1 Million to his account (Account # 75344) with Banque Safra France (Account # 101WA274151-000) through correspondent bank Wachovia Bank, New York, New

York, International Branch, New York, New York for further deposit into UBS AG Stamford, Connecticut, US (Account BC UBS W 0533) (See Exhibit F).

**END REPORT.**



Form nº 93
**Bill of Indictment**

**Lebanese Republic**
**Ministry of the Justice**

Beirut Prosecution Authority
Date: April 28, 2004
Nº of the action: 559                 Judgment nº: 353

The Prosecution Authority formed of Messrs Judges,
The President: Jamil BAYRAM
The two counselors : Ghada AOUN and Imad KABALAN

### Upon verification and deliberation

And after having taken knowledge of the report of the Appeal Public Prosecution, on April 22, 2004, under nº 1836/2004,Through which it demands:

1 - to accuse defendant Rana Abdul Rahim KOLEILAT, her mother's name is Massarra, birth year and place: 1967, Beirut, wherein she is domiciled, Single, educated, Lebanese, her civil register nº: 2839, Mazraa. She had been contradictorily arrested on February 4, 2004, and si still under arrest;
And Joumana Mohamad AYYAS, her mother's name is : Salwa, date and place of Birth: 1959, Beirut wherein she is domiciled, married, educated, Lebanese, her civil register nº is: 1541, Bachoura -Beirut. She also, had been contradictorily arrested on February 4, 2004, and still is under arrest. The two above-mentioned parties were arrested for the crime articles 459/460 and 459 / 460/454P.C. provides for.

2 - to accuse defendant Rana Abdul Rahim KOLEILAT in accordance with the article 655 of the Penal Code



3 - to accuse the defendant, Joumana Mohamad AYYAS, in accordance with the article 655/219 of the Penal Code,

4 – to adjoin the crime with the offense for concordance.

After having verified the two Merits summon-up, establish by Beirut Appeal Public Prosecution, on February 24, 2004 and April 17, 2004, in addition to the ordinance of Beirut First Judge of Instruction, dated April 21, 2004, rendered under nº 51/2004 as well as on all the exhibits of the present action,

Consequently to the instructions that occurred, the following appears :

**First: The Facts**

On November 14, 2003, a claim summon was registered at the Clerk office of Beirut Cassation Prosecution Office under the nº 4555/M/2003, with constitution of civil party. Yet, the two following plaintiffs filed it:
1 - Riad Toufic SALAMEH in person, and as of his quality of Governor of the Bank of Lebanon.
2 - Bank of Lebanon,
And so against an unknown party as well as any other parties that the instruction reveals to be the author or the intervening party or accomplice or instigator, relatively to the subject-matter:
Falsification and use of forgery as articles 453 and following, 471, 655 and following of the Penal Code provide.

On November 17, 2003, the two Plaintiffs Adnan and Ibrahim ABOU AYYACHE lodged a direct complaint, while constituting themselves as civil parties, against the defendant: Rana Abdul Rahim KOLEILAT and all other parties that the instruction reveals, in addition to the party being required to intervene H.E, The Governor of the Bank of Lebanon, in person and as of his professional quality, in addition to being the victim who underwent the crime of official document falsification in his name, since the defendant had taken advantage of such acts, for her personal



0 2 OCT 2004

interest, and compromised the two Plaintiffs, with regard to the penal falsification question, plus some organized fraud (in the sense of premeditated) and the usurp of the plaintiffs' funds, the misappropriation the exploitation and the abuse of her function or Occupational rank.

It appears that the two actions have been recorded to the Clerk office of Beirut first judge of instruction, who decided, on March 1, 2004, to join them together and to conduct their procedure simultaneously due to their concordance.

It appears out of the made instructions that on January 4, 1993, law n° 192 was published. Yet, it aims to facilitate the merger between banks. Article 2 of said law stipulates : Each merger operation between two banks or more depends on the approval of the Central Board of the Bank of Lebanon. However, the obtaining of such an approval requires the following formalities:

1 - to assign the central board, in its president's person, with the resolution of the board of directors of each concerned bank by the operation of merger, whilst including the demand of approval on the act of merger between the concerned banks.

The demand of approval is joined of:
- The temporary act of merger, which approval is sought-after
- The Budget of the last fiscal year of every concerned bank
- The auditors' report concerning the re-assessment of the aforesaid budget elements.
- A financial statement regarding every bank amongst those concerned, whilst holding the signatures of its chairman of the Board of Directors, on his personal responsibility, alike it was at the end of the month that precedes the date of the presentation of the merger demand.

Paragraphs 2, 3, & 4 of the aforesaid article stipulated about the Procedure to follow to execute the merger operation. It appears that on March 16, 1998, law n° 679 was enacted. It aims to extend the



application of the provisions of law n° 192, of January 4, 1993. Its first article stipulates that Applying the provisions of law 192 as above-mentioned is prolonged for five more years that shall expire on January 14, 2003.

-It appears that during 2002, and due to some financial problems, an idea was born among the directors of the two banks: Al - Madina, and the Allied Credit. Thus, it occurred to the two Plaintiffs Adnan and Ibrahim ABOU AYYACHE to adopt the idea to merge the two aforementioned banks, becoming known thus, under one sole name, « Al - Madina Bank» in accordance with the two aforementioned laws n° 192 and 679.

On November 8, 2002, Adnan ABOU AYYACHE addressed to the Governor of the Bank Of Lebanon a letter, where he notifies him, that as of his quality of Chairman of the Board of each one of the two banks « Al - Madina and The Allied Credit Banks, he decided to proceed with serious steps in order to merge said two banks as soon as possible, while hoping that such measurement shall win the Governor's confidence. This letter was recorded before the Secretariat of the Governor Office, on November 11, 2002.

On January 13, 2003, Adnan ABOU AYYACHE, as of his quality of Chairman of the Board, General Manager of Al – Madina Bank, and Sheik Ibrahim ABOU AYYACHE, as of his quality of Vice-President of Board of Director, General Manager of the Allied Credit Bank decided to apply before the Central board of The Bank of Lebanon, in order to merge the two banks. Their application was joined with numerous documents, but they lacked the auditor' report relatively to the assessment of the elements of the budget of the two banks, whose fusion is solicited, in addition to lacking the budget of the year 2002. However the Bank of Lebanon took no resolution to follow-up on the demand. Thus, the financial problems of the two banks persisted to worsen, and signs of manipulation of funds of the depositories appeared.



0 2 OCT 2004

It appears that on November 8, 2003, a meeting was held at the Bank of Lebanon, between The Governor of the BDL and the two Parties: Saleh SSAB and Jamil HAIDAR, brothers-in-law of Adnan ABOU AYYACHE, in presence of their lawyers Me Antoine GHANEM, in order to debate the question of the deficit, which signs were clearly noticed at the bank. They also debated other banking issues. During the aforesaid meeting, Saleh SAAB asked the Governor to ensure him a loan of twenty or thirty millions of American dollars to cover the obstinate deficit after the operation of liquidation of real estates. But the Governor of the BDL refused this demand because of being unauthorized. As a reply, Saleh opened his portfolio, wherefrom he took a letter carrying the date of November 25, 2002 under the address and Logo of the BDL – The Central Board, in addition to having a reference n° 377/MM/17, further to a signature, imputed to be the one of the Governor of the Bank Of Lebanon. The aforesaid letter was addressed to the administration of the Bank Al- Madina, regarding the approval on the merger. The aforesaid letter underlined that the Central Council, during its meeting held on November 20, 2002, took the resolution n° 5/29/02 concerning the approval on the operation of merger between the two Al-Madina and The Allied Credit banks, in addition to according a support-loan to Al – Madina Bank, valuing two hundred fifty billions of Lebanese pounds, for a term of thirty years, further to being exempted of all interest rates, so long as such sums are immediately registered in the account of Al-Madina Bank. The letter included at its end a mention that a notification was made to the commission of control on banks, the Legal Affairs Department, the Banks Administration, the Department of Statistics and Economic Researches. As soon as he got acquainted with this letter, the Governor was astonished and denied immediately (challenged) that it was him who issued it or that the signature affixed at its end belonged to him and that he actually adopted. Then, Saleh SAAB produced a second letter whose issuance was also imputed to be of the Governor's whilst being dated on December 9, 2002. This letter carried also the address of the BDL and its adopted logo, in addition to the expression: Central Board and the n° 377/MM/17. This second produced letter was addressed to the Chairman of the Board of AL-MADINA Bank, with



0 2 OCT 2004

regard to the transfer of the sum of one hundred eighty millions of American dollars. It stipulated that the Governor of the BDL and following his verification and since he got acquainted with the letter addressed by the Chairman of The Board of Al-Madina Bank, ref. N⁰ 222/M/1223, on November 21, 2002, relatively to the transfer of the sum of two hundred millions of American dollars before the end of the month of November 2002, the Bank of Lebanon called him to execute the transfer of the balance of the sum before December 12, 2002, otherwise it would be obliged to have resort to the necessary procedures, and to withdraw the loan of support.

It appears that as soon as the Governor had knowledge of this second document, he denied having issued such letter as well as other documents that Saleh SAAB produced to him, which matter urged him it to file before the Appeal General Prosecution Office the above-mentioned complaint.

It appears that with reference to the instructions led by the Cassation Prosecution Bureau and Beirut first judge of instruction, in addition to the attestations or testimony of the Secretary of the Central Board at the Bank of Lebanon and the Legal Department Director therein that the documents Saleh SAAB produced were false, according to the following evidences:

- The Central Board was not held on November 20, 2002
- No notification is necessary to be served to neither the Commission of Control on the Banks nor near the legal Affairs department, nor to the Department of banks, nor to the one of Statistics and Economic Researches about the resolution of merger, in the event it would have taken place.

-The Merger operation between Al - Madina and The Allied Credits Banks has not been submitted to the Central board, nor was is deliberated. Accordingly no primordial or final resolution has been taken concerning the approval on the merger.

0 2 OCT 2004

- The adopted formula for the approval on the merger is very different from the one of the letter on November 25, 2002, supposed to be false. The BDL doesn't adopt customarily such way of letters for conditions of loan accord, term, currency, whereas with regard to the interests, it absolutely has no right to accord loans, without interests.

- Using a paper-sheet carrying the header of the Central board with its address is contrary to the applied rules. The central Board cannot issue such a document. The typing way, and the nature of the paper used are different from those sheets and expressions applied to print and to formulate the correspondences of the central bank.

The decree n° 5/29/2012 concerns another bank that doesn't have anything to do with the question of merger neither with Al – Madina Bank.

- The two produced letters, whose falsification is put forward carry the same n°: 377/M/217. However, that is an impossible thing to occur, relatively to the correspondences of the Central Bank.

It appears that the letter, alleged to be false, dated on December 9, 2002, has been addressed to plaitiff Adnan ABOU - AYYACHE in Saudi Arabia, by facsimile machine under n°: 346742, on December 10, 2002. This number comes back to the General Directorate of Al-Madina Bank. The telephone in question is at the office of the of defendant Joumana AYYAS who is the Secretary of defendant Rana Koleilat who, according to the heard witnesses, had the last word to say at the Al-Madina Bank, since her authority was therein absolute. She used to come daily to her work at the General Directorate of the Bank, all long 2002, with the exception of the two months of November and December, where she came there about three days per week only. The Chairman of the board of directors resides in a permanent way in Saudi Arabia, and his brother Ibrahim ABOU AYYACHE, didn't come to the bank that once or twice per week. That is why the correspondences addressed by the Bank of Lebanon were received by either Leila Chrara or by the two defendants



02 OCT 2004

Rana Koleilat or Joumana AYYASS. All correspondences ended up being handed to defendant Rana KLOEILAT who, after taking knowledge of it, put them back with either Leila Charara or in Joumana AYYAS, to be archived At the defendant's office, Joumana AYYAS, while some other used to stay with her to be used.

It appears that all correspondences regarding the two banks merger took place at the office of defendant Rana Koleilat, which issue is evidenced by the witness, Me. Othman ARAKGY who sent on December 11, 2002, to defendant Rana KOLEILAT, a confidential and private letter which object refers to the operation of Al - Madina S.A.L. and the Allied Credit S.A.L merger: Draft of the Minutes of the board of directors of Al-Madina S.A.L. Bank and the draft of the Minutes of the board of directors of the Allied Credit Bank, further to the draft of the preliminary contract of the merger and the draft of the letter that it is necessary to be address to the central board of the BDL.

It appears out of the documents of this action as well as out of the preliminary instructions and cross-examinations that the correspondences with defendant Adnan ABOU AYYACHE, at his domicile occurred via the offices of defendant Rana KOLEILAT, since 1999 and so upon the request of his brother.

It appears that the Cassation Attorney General led a local examination in the Offices of General Directorate of Al – Madina bank, on November 23, 2003. She raised a Minute containing her observations, and that reveals that some documents have been found in the cabinet of the of defendant Joumana AYYAS: a letter dated on February 23, 2001, its appearance reveals the establishment of a branch, located in Street Bechara El Khoury, The letter carries a signature imputed to the Governor of the BDL, as being addressed to the chairman of the board of directors of the Bank Al - Madina, under the n° 304/1.

While reviewing the correspondences archived at the Bank Al - Madina, we noticed that their number comes back to the initial content, which



had been replaced with another content, while keeping the Governor's signature.

In the same way, there were found to the office of defendant Joumana AYYAS five documents or white papers (blank) with regard to their content, but they all carry the Governor's signature as well. In addition, the initial document that carries the nº 377/MM / 17 on August 14, 1998, relates to opening three new branches of the Bank Al - Madina, the content of the aforesaid document has been covered while keeping the signature of the Governor and the emblem of the Central board. The aforesaid content has been replaced by photocopy, with regard to the merger that the alleged false letters underline.

It appears that defendant Rana KOLEILAT was the point of link between the BDL and plaintiff Adnan ABOU AYYACHE. She performed the following:

- On November 4, 2002, she addressed him a letter, she pretended to be given out by the Central Bank of Lebanon, concerning the increase of the Capital of the bank.

- She notified him by telephone, about the approval of the central board about the merger operation.

- On December 10, 2002, she sent him the alleged letter, dated on December 9, 2002 and that raises the invitation the Governor addresses to transfer the sum of two hundred millions of American dollars, in a maximum delay, corresponding to December 12, 2002 under reserve to withdraw the loan, which issue encouraged plaintiff Adnan ABOU AYYACHE, to transfer to the Bank of Lebanon the sum of hundred fifty millions of American dollars, divided on four remittances and that, as follows:

1 - twenty millions of American dollars, on November 29, 2002.
2 - eighty millions of American dollars on December 12, 2002.



3 - twenty five millions American dollars, on January 8, 2003.
4 - twenty five millions American dollars on January 8, 2003.

It appears that plaintiff Adnan ABOU AYYACHE had transferred, to the Central Bank of Lebanon, the sum of two hundred fifty millions American dollars. He also transferred the sum one hundred millions dollars. Yet, these two sums finished to be registered in the personal account of defendant Rana KOLEILAT, who presented a demand of setting her free.

These facts are supported with:

1 - the exploratory instructions and the cross-examinations.

2 - the complaint summons deposited by the Governor of the Bank of Lebanon.

3 - the direct complaint with constitution of civil party, as filed by Adnan and Ibrahim ABOU AYYACHE.

4 - the false documents.

5 - the significances of the defendant's declarations.

6 - the depositions of the witnesses.

7 - the minutes of the report led by the Cassation Prosecution Bureau.

8 - the totality of the proofs and indications that the instruction mentioned.

Second: the Law

Whereas we can conclude according to the instructions led relatively to this suit, according to the proofs that were stated and the relative indications to the existence of many false and in-forgery documents that


0 2 OCT 2004

were altered while imputing their issuance to the governor of the Bank of Lebanon and which are:

1 - the letter of November 25, 2002 that underlines the approval to merge Al - Madina S.A.L. and the Allied Credit S.A.L. banks, and the accord of the support loan.

2 - the letter of December 9, 2002, relative to the invitation that the Bank of Lebanon addressed to plaintiff Adnan ABOU AYYACHE, in order to transfer funds, subject to withdraw the loan otherwise.

3 - the letter of November 4, 2002, relative to the approval of the Bank of Lebanon to increase the Capital of Al – Madina Bank to become two hundred billions of Lebanese books.

4 - the letter of November 25, 2002, relative to the demand addressed by the Governor of the Bank of Lebanon to the Chairman of the Board of Directors at Al – Madina Bank, to transfer the sum of two hundred millions of American dollars before the end of the month.

5 - the letter of November 25, 2002, relative to confer to plaintiff Adnan ABOU AYYACHE, the right to open an account at the bank of Lebanon with the pertaining number.

6 - the letter of February 23, 2001 relative to the approval of the Bank of Lebanon concerning the opening of a branch of Al – Madina Bank, Cheikh Béchara El KHOURY street.

Whereas we can conclude, in reference to these letters that they carry all only one number, being 377/M.M / 17, proving that they are false, whereas the letter underlined by the clause 6 carries the n° 304/1, while it is false as well.

Whereas we can also conclude out of the executed instructions that the manipulation had been made with regard to the content of these letters,



02 OCT 2004

since some terms have been inserted, whereas they are different from the original terms, but the governor's signature had been kept and that, with regard to the photocopy, it created a new document thus relatively to the content and to elaborate a document that, doesn't actually exist.

Whereas it is verified that there were found blank documents, while carrying the Signature of the Governor and the emblem of the Bank of Lebanon, in the cabinet of defendant Joumana AYYAS, what proves that the operation of falsification and change of the aforesaid documents took place at the office of this latter, since she is the secretary of defendant Rana KOEILAT, and since it appears also that were in the same cabinet other documents ready to be altered.

Whereas and according to the aforementioned facts and according to the totality of the exhibits of the present action, we can conclude that defendant Rana KOULEILAT, taking into account that she had the first and the last word to say at the two banks: Al - Madina and the Allied Credit, that she herself controlled the operations of the documents' alteration, especially that she herself addressed to plaintiff Adnan ABOU AYYACHE the documents, which are alleged to be false.

Whereas it appears out of the instructions that defendant Rana KOLEILAT usurped funds sent by plaintiff Adnan ABOU AYYACHE and seized them at her debit account to decrease the deficit, although the so-called funds were affected to another destination.

Whereas, the produced documents are official and imputed to be given out by the Governor of the BDL, in his official and non-personal quality.

Whereas and according to all what precedes, the act of the two defendants Rana Abdul Rahim KOLEILAT and Joumana Mohamad AYYAS as above- described, constitute the crime provided and punished by the two articles 459/460 of the Penal code.



02 OCT 2004

Whereas the act of the two defendants, concerning the fact to have sent these false letters and their use do constitute the crime provided and punished by the articles 459/460/254 of the Penal Code.

Whereas that the act of defendant Rana KOLEILAT concerning her theft of funds transferred by plaintiff Adnan ABOU AYYACHE, do constitute the offense of fraud, as foreseen by the article 655 of the Penal code, whereas the act of defendant Joumana AYYAS, since she intervened in the same crime, apply on the article 655/219 P. C.

Whereas defendant Rana KOLEILAT presented a conclusion, where she asks to widen the extent of the instruction.

Whereas the judiciary Authority and after having verified the conclusion as well as the joined pieces doesn't see any utility there, and decided to reject it therefore.

Whereas, taking account of the nature of the offense, of its circumstances, the length of arrest of the defendant that could give the right to value the circumstances, the present judiciary authority decided to reject the demand of setting free defendant Rana KOLEILAT.


For These reason
Beirut Judicial Authority of accusation decides:
1 - to accuse the two defendants Rana Abdul Rahim KOLEILAT and Joumana Mohamad AYYAS, each of which identity is herein-above described, with the crime foreseen by the articles 459/460 and 459 / 460 / 454 of the Penal Code, while returning a memorandum or order to arrest the two of them and to drive them to the place of arrest suited before the Penal court in Beirut, and there to be judged for the acts that they are accused of.

2 - to accuse the defendant, Rana Abdul Rahim KOLEILAT of the offense foreseen by the article 655 of the Penal Code.



0 2 OCT 2004

3 - to accuse defendant Joumana Mohamad AYYAS of the delict foreseen by the article 655 / 219 of the Penal code.

4 - to Join the crime by the offense seen their concordance.

5 - to charge the two defendants with the Judicial fees costs jointly.

6 - to reject the demand of instruction expansion, presented by Rana KOLEILAT because of being useless.

7 - to reject the demand of setting in liberty of defendant Rana Abdul Rahim KOLEILAT and to keep her under arrest.
8 - to refer the documents before Beirut Appeal General Attorney Bureau, to deposit them before the competent judicial authority.

A Judgment rendered at the room of deliberation in Beirut, on April 28, 2004.

The counselor                To counsel              The President
(Signature)                  (Signature)             (Signature)
Compliant copy,
delivered to Beirut August 25, 2004
the clerk in chief Abbas Kheireddine (Signature And Seal)
-----------------------------------------------------------------------------------
True translation of the Arabic text herewith attached
The Sworn Translator **Houssam Ahmad RIHAN**

02 OCT 2004