UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————

ADNAN ABU AYYASH,                              )
                                               )
          Plaintiff,                           )          04 – CV- 9201 (GEL)
                                               )
v.                                             )          **(ECF Case)**
                                               )
BANK AL-MADINA, UNITED CREDIT                  )
BANK, RANA ABDELRAHIM KOLEILAT,                )
TAHA ABDELRAHIM KOLEILAT,                      )
BASSEL ABDELRAHIM KOLEILAT, RENE               )
MOAWAD, JOUMANA MOHAMMAD                       )
AYYAS, and JOHN DOES 1-10,                     )
                                               )
          Defendants.                          )
—————————————————————              )


## DEFENDANT RENE MOAWAD'S MOTION
## <u>TO DISMISS PLAINTIFF'S COMPLAINT</u>


Bradley I. Ruskin (BR 8489)
Peter J.W. Sherwin (PS 3639)
Matthew J. Morris (MM 5179)
Proskauer Rose LLP
1585 Broadway
New York, NY 10036-8299
Tel.: (212) 969-3000

*Attorneys for defendant René Moawad*

# <u>TABLE OF CONTENTS</u>

Pages

TABLE OF AUTHORITIES ............................................................................... iii

PRELIMINARY STATEMENT ......................................................................... 1

SUMMARY OF ALLEGATIONS AND STATEMENT OF FACTS ................................. 5

ARGUMENT ................................................................................................ 12

I.     THE ACTION SHOULD BE DISMISSED FOR  LACK OF SUBJECT
MATTER JURISDICTION ................................................................... 12

       A.    The Court Lacks Subject Matter Jurisdiction under the "Conduct Test"............. 13

       B.    The Court Lacks Subject Matter Jurisdiction under the "Effects Test"................ 17

II.    THE ACTION SHOULD BE DISMISSED FOR LACK  OF PERSONAL
JURISDICTION OVER MR. MOAWAD ................................................... 17

       A.    The RICO Long-Arm Provision Does Not Apply Because  Mr. Moawad
Was Not Served in the United States ................................................ 18

       B.    The Court Lacks Personal Jurisdiction  under New York's Long-Arm
Statute.......................................................................................... 20

       C.    The Exercise of Personal Jurisdiction over  Mr. Moawad Would Violate
the Due Process Clause ................................................................. 24

III.   THE ACTION SHOULD BE DISMISSED ON THE GROUND OF FORUM
NON CONVENIENS ........................................................................... 25

       A.    The Litigation May Be Conducted in Lebanon ................................. 26

       B.    Plaintiff's Choice of Forum Is Entitled to No Deference..................... 29

       C.    Dismissal Is in the Private and Public Interest ................................. 31

IV.   THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO STATE A
CAUSE OF ACTION ........................................................................... 34

       A.    The RICO Claim Should Be Dismissed Because Dr. Ayyash Failed to
Plead Adequately Any Predicate Acts ............................................. 35

       B.    The RICO Claim Should Be Dismissed Because Dr. Ayyash Failed to
Plead a Pattern of Racketeering Activity ......................................... 38

i

    C.      The RICO Conspiracy Claim Should Be Dismissed ...........................................42

    D.      The Fraud Claim Should Be Dismissed .............................................................43

CONCLUSION.....................................................................................................................44

# **TABLE OF AUTHORITIES**

Pages

## **Cases**

*ACLI Int'l Commodity Servs., Inc. v. Banque Populaire Suisse*,
 652 F. Supp. 1289 (S.D.N.Y. 1987) ............................................................................33

*Airlines Reporting Corp. v. Aero Voyagers, Inc.*,
 721 F. Supp. 579 (S.D.N.Y. 1989) .............................................................................41

*Anderson v. Indiana Black Expo, Inc.*,
 81 F. Supp. 2d 494 (S.D.N.Y. 2000) ............................................................. 19, 20, 22

*Asahi Metal Industry Co. v. Superior Court*,
 480 U.S. 102 (1987) ................................................................................................24, 25

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
 171 F.3d 779 (2d Cir. 1999)........................................................................................23

*Baptichon v. Nevada State Bank*,
 304 F. Supp. 2d 451 (E.D.N.Y. 2004), *aff'd*, 125 Fed. Appx. 374 (2d Cir. 2005)  ..........23

*Base Metal Trading SA v. Russian Aluminum*,
 253 F. Supp. 2d 681 (S.D.N.Y. 2003),
 *aff'd*, 98 Fed. Appx. 47 (2d Cir. 2004)........................................................ 27, 29, 33, 34

*Bensusan Rest. Corp. v. King*,
 126 F.3d 25 (2d Cir. 1997).........................................................................................23

*Biofeedtrac, Inc. v. Kolinor Optical Enters. & Consultants, S.R.L.*,
 817 F. Supp. 326 (E.D.N.Y. 1993).............................................................................19

*Butte Mining PLC v. Smith*,
 76 F.3d 287 (9th Cir. 1996).........................................................................................12

*Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.*,
 117 F.3d 655 (2d Cir. 1997)........................................................................... 16, 35, 36

*Carey v. Bayerische Hypo-Und Vereinsbank AG*,
 370 F.3d 234 (2d  Cir. 2004)......................................................................... 26, 32, 33

*Carnegie-Mellon Univ. v. Cohill*,
 484 U.S. 343 (1988) .....................................................................................................43

*Casio Computer Co. v. Sayo*,

2000 WL 1877516 (S.D.N.Y. Oct. 13, 2000) ...............................................................23

*Chanayil v. Gulati*,
169 F.3d 168 (2d Cir. 1999)......................................................................36

*Cofacredit, S.A. v. Windsor Plumbing Supply Co.*,
187 F.3d 229 (2d Cir. 1999)......................................................................41

*Continental Field Service Corp. v. ITEC Int'l, Inc.*,
894 F. Supp. 151 (S.D.N.Y. 1995) ...........................................................22

*Daewoo Int'l (Am.)Corp.Creditor Trust v. Orion Eng'g & Serv. Inc.*,
2003 U.S. Dist. LEXIS 18696 (S.D.N.Y. Oct. 20, 2003) ...............................22

*Dale v. Banque SCS Alliance S.A.*,
2004 WL 2389894 (S.D.N.Y. Oct. 22, 2004) ........................................22, 23

*Daventree Ltd. v. Republic of Azerbaijan*,
349 F. Supp. 2d 736 (S.D.N.Y. 2004) ........................................................25

*Discon, Inc. v. NYNEX Corp.*,
93 F.3d 1055 (2d Cir. 1996),
*vacated on other grounds*, 525 U.S. 128 (1998) ...................................39, 43

*Dubai Islamic Bank v. Citibank, N.A.*,
256 F. Supp. 2d 158 (S.D.N.Y. 2003) ........................................................36

*Feirstein v. Nanbar Realty Corp.*,
963 F. Supp. 254 (S.D.N.Y. 1997) .............................................................41

*First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*,
385 F.3d 159 (2d Cir. 2004)..............................................................*passim*

*First Nationwide Bank v. Gelt Funding Corp.*,
27 F.3d 763 (2d Cir. 1994), *cert. denied*, 513 U.S. 1079 (1995) ....................36

*Furman v. Cirrito*,
828 F.2d 898 (2d Cir. 1987).....................................................................36

*GICC Capital Corp. v. Tech. Fin. Group*,
67 F.3d 463 (2d Cir. 1995)..................................................................40, 41

*Gibbon v. Am. Univ. of Beirut*,
1983 U.S. Dist. LEXIS 13401 (S.D.N.Y. Sept. 27, 1983)..........................28, 29

*Gulf Oil v. Gilbert*,

iv

330 U.S. 501 (1947) ................................................................................ 26, 32, 33

*H.J., Inc. v. Northwestern Bell Tel. Co.*,
  492 U.S. 229 (1989) ........................................................................... 39, 40, 41

*Hecht v. Commerce  Clearing House, Inc.*,
  897 F.2d 21 (2d Cir. 1990)....................................................................... 36, 37

*Int'l Shoe Co. v. Washington*,
  326 U.S. 310 (1945) ...................................................................................... 24

*Iragorri v. United Techs. Corp.*,
  274 F.3d 65 (2d Cir. 2001)................................................................. 25, 26, 29

*Ismail v. Am. Univ. of Beirut*,
  246 F. Supp. 2d 330 (S.D.N.Y. 2003) ........................................... 28, 29, 33, 34

*Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*,
  26 F. Supp. 2d 593 (S.D.N.Y. 1998) ...................................................... 18, 19

*Linens of Europe, Inc. v. Best Mfg., Inc.*,
  2004 WL 2071689 (S.D.N.Y. Sept. 16, 2004).............................................. 40

*Madanes v. Madanes*,
  981 F. Supp. 241 (S.D.N.Y. 1997) ........................................................ 14, 15

*Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  709 F. Supp. 1279 (S.D.N.Y. 1989) ............................................................ 19

*Mills v. Polar Molecular Corp.*,
  12 F.3d 1170 (2d Cir. 1993)......................................................................... 35

*Monsanto Int'l Sales Co. v. Hanjin Container Lines, Ltd.*,
  770 F. Supp. 832 (S.D.N.Y. 1991) .............................................................. 32

*Nasser v. Andersen Worldwide Societe Cooperative*,
  2003 U.S. Dist. LEXIS 16710 (S.D.N.Y. Sept. 24, 2003)............................. 14

*Nordic Bank PLC v. Trend Group, Ltd.*,
  619 F. Supp. 542 (S.D.N.Y. 1985) .............................................................. 19

*North S. Fin. Corp. v. Al-Turki*,
  100 F.3d 1046 (2d Cir. 1996)................................................... 12, 13, 14, 17

*Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP*,
  2004 U.S. Dist. LEXIS 24900 (S.D.N.Y. Dec. 9, 2004) .......................... 14, 17

*OSRecovery, Inc. v. One Groupe Inter'l, Inc.,*
  354 F. Supp. 2d 357 (S.D.N.Y. 2005) ................................................... 14, 17

*P.T. United Can Co. v. Crown Cork & Seal Co.,*
  138 F.3d 65 (2d Cir. 1998)......................................................... 18, 19, 27, 28

*Panama Processes, S.A. v. Cities Serv. Co.,*
  500 F. Supp. 787 (S.D.N.Y. 1980), *aff'd,* 650 F.2d 408 (2d Cir. 1981) .........................34

*Pier Connection, Inc. v. Lakhani,*
  907 F. Supp. 72 (S.D.N.Y. 1995) ...........................................................40, 41

*Piper Aircraft Co. v. Reyno,*
  454 U.S. 235 (1981) ...............................................................26, 29

*Powers v. British Vita, P.L.C.,*
  57 F.3d 176 (2d Cir. 1995)...............................................................41

*Price v. Gast,*
  2000 U.S. Dist. LEXIS 4552 (S.D.N.Y. Apr. 11, 2000) ..................................... 36, 37, 38

*Rampersad v. Deutsche Bank Secs., Inc.,*
  2004 WL 616132 (S.D.N.Y. Mar. 30, 2004) ...................................................41

*Scelsa v. City Univ. of N.Y.,*
  76 F.3d 37 (2d Cir. 1996)...............................................................12

*Schertenleib v. Traum,*
  589 F.2d 1156 (2d Cir. 1978)...............................................................32, 34

*Shaw v. Rolex Watch U.S.A., Inc.,*
  745 F. Supp. 982 (S.D.N.Y. 1990) ...............................................................19

*Team Obsolete Ltd. v. A.H.R.M.A. Ltd.,*
  2002 U.S. Dist. LEXIS 10737 (E.D.N.Y. Mar. 15, 2002) ................................................23

*Thai Airways Int'l Ltd. v. United Aviation Leasing B.V.,*
  891 F. Supp. 113 (S.D.N.Y. 1994), *aff'd,* 59 F.3d 20 (2d Cir. 1995)..............................41

*United States v. Altman,*
  48 F.3d 96 (2d Cir. 1995)............................................................... 36, 37,  38

*Vicon Fiber Optics Corp. v. Scrivo,*
  201 F. Supp. 2d 216 (S.D.N.Y. 2002) ............................................................ 40, 41, 42

*Weizmann Inst. of Sci. v. Neschis,*
  229 F. Supp. 2d 234 (S.D.N.Y. 2002) ....................................................................41, 42


## **Statutes**


18 U.S.C. § 1343 ..............................................................................................................36

18 U.S.C. § 1956(a)(2)(A) ................................................................................................37

18 U.S.C. § 1961(5) .....................................................................................................35, 39

18 U.S.C. §§ 1962(a) ....................................................................................................38, 39

18 U.S.C. §§ 1962(b) ....................................................................................................38, 39

18 U.S.C. §§ 1962(c) ...............................................................................................38, 39, 43

18 U.S.C. §§ 1962(d) .......................................................................................................42

18 U.S.C. § 1964(b) .........................................................................................................19

18 U.S.C. § 1965 .........................................................................................................18, 19

18 U.S.C. § 1965(a) ..................................................................................................18, 19, 20

18 U.S.C. § 1965(b) .....................................................................................................18, 19

28 U.S.C. § 1367(a) .........................................................................................................43

Fed. R. Civ. P. 9(b) .....................................................................................................35, 38

Fed. R. Civ. P. 12(b)(1) ......................................................................................................8

Fed. R. Civ. P. 12(b)(2) ......................................................................................................8

Fed. R. Civ. P. 12(b)(6) ......................................................................................................8

N. Y. C.P.L.R. § 301 ..................................................................................................19, 20, 21

N. Y. C.P.L.R. § 302 .....................................................................................................19, 21

N. Y. C.P.L.R. § 302(a) ................................................................................................21, 22

N. Y. C.P.L.R. § 302(a)(1) ............................................................................................22, 23

N. Y. C.P.L.R. § 302(a)(2) ........................................................................................ 23, 24

N. Y. C.P.L.R. § 302(a)(3) ............................................................................................. 24

N. Y. C.P.L.R. § 302(a)(3)(i) .......................................................................................... 24

N. Y. C.P.L.R. § 302(a)(3)(ii) ......................................................................................... 24

## PRELIMINARY STATEMENT

This action has no business before this Court for several fundamental reasons that are apparent on the face of the complaint: lack of subject matter jurisdiction; lack of personal jurisdiction; *forum non conveniens*; and failure to plead an actionable RICO claim.

Plaintiff Adnan Abu Ayyash, a Lebanese and Saudi citizen resident in Saudi Arabia, alleges that the defendants, each a Lebanese citizen and resident or Lebanese entity, defrauded him, supposedly obtaining through the forgery and deceit of defendant Rana Koleilat hundreds of millions of dollars that he deposited in one of two Lebanese banks he owns. Dr. Ayyash does not allege that any of the alleged forgeries or deceit occurred in or was directed from the United States or even that a material part of the fraud occurred in the United States, but, nonetheless, he brings suit in this Court claiming violations of RICO and seeking treble damages. His only basis for bringing suit here is that one defendant, movant René Moawad, allegedly transferred about $2 million from Mr. Moawad's account at one of the Lebanese banks to his accounts in European financial institutions via three wires that were routed through, but not deposited in, New York correspondent banks. That is legally insufficient. Moreover, although Dr. Ayyash labels this as part of the asserted "wire fraud" and "money laundering" because, he says, that money used to be in his account, he makes this assertion solely upon "information and belief" and fails even to allege the factual basis on which his purported "information and belief" is founded. That allegation is also thus procedurally insufficient.

Dr. Ayyash has engaged in blatant forum shopping, grabbing for treble damages and the *in terrorem* effect of RICO. That is confirmed by the fact that he has already commenced litigation in Lebanon against the same defendants and based on the same alleged fraud. This is a shameless attempt to use American courts and law to resolve a dispute that has

nothing to do with the United States and to gain improper leverage in foreign litigation.  This Court should not countenance that.

Not surprisingly, this dispute's complete lack of any material link with New York translates into the following multiple, independent reasons why the action should be dismissed:

**First**, the Court should dismiss for lack of subject matter jurisdiction because RICO does not apply to, and the federal courts are ill used as a venue for, foreign disputes with such attenuated connections with the United States.  This action fails both of the relevant jurisdictional tests.  The "conduct test" requires much more conduct within or directed to the United States than three wire transfers over one week through correspondent banks where the transferor does not even have an account.  (Point I.A.)  The "effects test" requires a showing, completely absent here, that the plaintiff suffered the alleged injury in the United States. (Point I.B.)

**Second**, the Court should dismiss for lack of personal jurisdiction over Mr. Moawad, who does not have remotely the level of forum contacts the relevant jurisdictional statutes require, let alone those sufficient not to violate the Due Process Clause.  Under RICO's long-arm provision, foreign defendants are subject to the jurisdiction of United States courts only if they are served with process here, and in this case René Moawad, like the other defendants, was not.  (Point II.A.)  Additionally, there is no jurisdiction over Mr. Moawad under New York's long-arm statute.  The Court does not have general jurisdiction over Mr. Moawad because he does not reside or do business here.  (Point II.B.1.)  The Court also does not have specific jurisdiction over him because:  (1) his wire transfers do not constitute "transacting business" in New York from which the claims arise; (2) he is not alleged to have been physically within New York when he committed any tortious act; and (3) his asserted tort outside of New York did not

2

have a sufficient effect within New York because the alleged injury to Dr. Ayyash was in Lebanon, not New York.  (Point II.B.2.)  In any event, the exercise of personal jurisdiction over Mr. Moawad would be incompatible with the Due Process Clause, given the paucity of his contacts with New York and the United States.  (Point II.C.)

   **Third**, the Court should dismiss for *forum non conveniens* because New York is manifestly an inconvenient forum and Lebanon is manifestly the much more convenient forum. The Lebanese courts unquestionably provide an adequate alternative forum:  they have jurisdiction over the parties, all of whom are Lebanese; they provide a civil remedy for the asserted fraud that is an adequate substitute for the claims here; and they are capable of dispensing fair and efficient justice.  Indeed, Dr. Ayyash must have recognized as much because he is currently suing both Mr. Moawad and the other defendants in Lebanon, alleging most of the same misconduct.  (Point III.A.)  Dr. Ayyash's choice of the New York forum is entitled to absolutely no deference, as he has plainly sued here solely for forum-shopping reasons and not because of any bona fide convenience to him or legitimate reason.  (Point III.B.)  Also, Lebanon is the vastly superior forum compared to New York in light of all of the applicable private- and public-interest factors because the convenience of the parties and of non-party witnesses would be far better served if they were not required to fly from Lebanon to New York to testify, the evidence is located in Lebanon and written in Arabic, the Lebanese courts have far greater facility with the applicable Lebanese law, and Lebanon has a far greater interest than the United States in resolving the dispute.  (Point III.C.)

   **Fourth**, the Court should dismiss for failure to state a claim upon which relief can be granted.

- Dr. Ayyash has failed to plead actionable wire fraud predicate acts.  The only uses of the wires he alleges that even touched the United States are the three transfers from Mr. Moawad's account in Lebanon to his accounts in Europe, which allegedly went through New York correspondent banks.  That is insufficient to state a wire fraud claim in violation of U.S. criminal law because it is not material to the underlying scheme.  Moreover, Dr. Ayyash failed to allege the factual support for his assertion upon information and belief that these funds were actually his money rather than Mr. Moawad's.  Indeed, it is highly suspect that he made that critical allegation upon information and belief because whether or not that is the case should be something he can ostensibly assert on his own knowledge as owner of the Lebanese bank.  Thus, he lacks an adequately pled wiring into the United States in furtherance of the alleged scheme sufficient to make out his wire fraud RICO predicates, and the same defect is fatal to his money laundering predicates, which depend wholly on the underlying wire fraud allegations.  (Point IV.A.)

- Dr. Ayyash also failed to allege a pattern of racketeering activity with the required continuity.  The purported pattern does not have open-ended continuity because the alleged conduct was inherently terminable; it was bound to conclude (and plaintiff alleges it did conclude) when the banks failed.  The purported pattern also does not have close-ended continuity because the predicate acts only took place over a four-month period, far less than the minimum of two years the Second Circuit has found sufficient.  Even were the brevity of the asserted predicate acts not dispositive, this still remains a typical single-scheme, single-victim claim where only a few predicate acts are alleged, which further indicates the absence of a pattern.  (Point IV.B.)

- Because Dr. Ayyash has failed to allege a substantive violation of RICO, his RICO conspiracy claim, which in any event is extremely meager, necessarily fails as well. (Point IV.C.)

- Because the fundamentally flawed RICO claims are the only basis for federal jurisdiction, this Court should decline to exercise supplemental jurisdiction over Dr. Ayyash's remaining claims for breach of Lebanese law.  (Point IV.D.)

## SUMMARY OF ALLEGATIONS AND STATEMENT OF FACTS

### SUMMARY OF ALLEGATIONS

Dr. Ayyash is a citizen of Lebanon and Saudi Arabia.  (Complaint ("Compl.") ¶ 6 (Docket #1).)[1]  He is the majority owner since 1984 of defendants Al-Madina Bank and United Credit Bank ("UCB") (together, the "Banks"), which are organized under Lebanese law.  (*Id.* ¶¶ 6-8, 18.)  All of the individual defendants are also Lebanese.  (*Id.* ¶¶ 9-13.)  Two of the defendants, Rana Koleilat and her aunt, Joumana Ayyas, were Bank employees (*id.* ¶¶ 9, 13, and two others, Taha and Bassel Koleilat, are Ms. Koleilat's brothers (*id.* ¶¶ 10-11.  Alone among the defendants, Mr. Moawad is not alleged to be a Bank employee or a member of the Koleilat family, although he purportedly had a social connection with Ms. Koleilat.  (*Id.* ¶ 12.)  There is no allegation that any party other than Dr. Ayyash, who is domiciled in Saudi Arabia (*id.* ¶ 6), resides anywhere other than Lebanon.

Soon after Dr. Ayyash and his brother Ibrahim acquired the Banks, Ms. Koleilat began working for Al-Madina Bank and rose to a position of responsibility in that bank.  (*Id.* ¶¶ 22-24.)  Dr. Ayyash alleges that she formed the hub of a corrupt enterprise including, as the spokes, all of the remaining defendants, and that defendants' purported scheme began "at least in

---

[1]    For the Court's convenience, a copy is annexed as Exhibit A to the accompanying Declaration of  Peter J.W. Sherwin ("Sherwin Decl.").)

or about November 1999." (*Id.* ¶¶ 5, 20, 62-63.)  There are no allegations, however, as to how

the Banks or Ms. Koleilat's brothers, Taha and Bassel, participated in this scheme, and no

allegations about any specific criminal acts by any defendant at any time during the first three

years of the purported scheme.  The only allegations concerning this period are that:

(1) Dr. Ayyash "unwittingly" transferred $670 million into account 69911 at Al-Madina Bank

between November 1999 and November 2002; (2) account 69911 "was a 'dummy' account set

up by Rana" (but there is no explanation of what, exactly, this means, or that Ms. Koleilat took

money out of the account during this period); and (3) in late 2002 or early 2002 Ms. Koleilat and

Dr. Ayyash's Al-Madina Bank "set up a banking relationship with the Central Bank of Iraq,

which was operated contrary to acceptable banking practices."[2]  (*Id.* ¶¶ 30-31, 50.)

        Dr. Ayyash also alleges, upon unsupported "information and belief," that by

October 15, 2002 defendants had "embezzled" certain funds that were in Mr. Moawad's account

at UCB on that date.  (*Id.* ¶ 42.)  There is no indication of the factual basis on which this

purported belief is founded.  Significantly, there is also no explanation why Dr. Ayyash, who

remains both Banks' majority owner, is reduced to pleading merely on information and belief

that supposedly funds from his account at his bank, Al-Madina Bank, were transferred three

years ago into Mr. Moawad's account at another of Dr. Ayyash's banks, UCB.  Dr. Ayyash then

alleges that between October 15 and 21, 2002 Mr. Moawad wired $2,060,000 from his account at

---

[2]    There is also an allegation, on unsupported information and belief, that at some
unspecified time Ms. Koleilat gave money she allegedly embezzled to the terrorist organization
Hezbollah.  (Compl. ¶ 48.)  Like the Iraqi connection, this is apparently intended, simply by the
assertion that Ms. Koleilat has unsavory contacts, to serve as a proxy for alleging the elements of
a money laundering claim.  There is no allegation that Mr. Moawad gave money to Hezbollah or
had any role in the process by which Dr. Ayyash's Banks maintained relationships with the
Central Bank of Iraq, or that any of these transactions involved the United States; indeed, the
Iraqi transactions were allegedly designed expressly to avoid contact with the United States
(*id.* ¶ 51).

UCB to his accounts at three European financial institutions – Banque Safra France, EDF Man International, Inc., and Ferrier Lullin N Cie SA – and that in each case the funds passed through correspondent bank Wachovia Bank, International Branch, New York and another correspondent bank in New York or Connecticut.  (*Id.* ¶¶ 39-41.)  These three transfers from Lebanon to Europe via New York are the only alleged contacts with the United States throughout this entire asserted scheme.

Dr. Ayyash also alleges that Ms. Koleilat thereafter committed a series of forgeries designed to induce him to transfer funds into the Banks, where they were "diverted into a 'dummy' account."  (*Id.* ¶ 28.)  The forgeries allegedly consisted of three letters from the Lebanese Central Bank to Dr. Ayyash requiring him to deposit funds at the Central Bank as collateral for loans to Al-Madina Bank in connection with Dr. Ayyash's intended merger of his two banks.  (*Id.* ¶¶ 29, 32-34.)  Dr. Ayyash alleges that in purported reliance on these forgeries he transferred $250 million into Al-Madina Bank between November 29, 2002 and January 8, 2003.  (*Id.* ¶¶ 35-37.)  Dr. Ayyash does not allege that Ms. Koleilat wired or mailed any of these forged documents to, within, or from the United States.  Dr. Ayyash then alleges that, during the same period, Ms. Koleilat issued checks totaling $150 million in an attempt to withdraw money from the Banks, causing the Banks to collapse, that Dr. Ayyash then "infused $470 million of his own funds" into the Banks to try to stem the collapse, and that he lost these funds and threatened to sue Ms. Koleilat for their return.  (*Id.* ¶¶ 54-57.)

In a final appeal to credulity, Dr. Ayyash alleges that Ms. Koleilat promised to make these losses good by signing over to him the $4 billion in her Swiss bank account, provided that he first paid her the difference between "the balance of her account" and "the amount she owed him," and that he complied, losing additional hundreds of millions when the Swiss bank

account proved to be a fiction.  (*Id.* ¶¶ 58-60.)  These transfers are not alleged to have anything

to do with the United States, and, although Dr. Ayyash alleges that Ms. Koleilat issued some of

her checks in the names of the other defendants, he alleges nothing to tie them to Mr. Moawad.

STATEMENT OF FACTS[3]

### Mr. Moawad and the United States

Mr. Moawad has practically nothing to do with the United States or with any of

the other defendants.  He is not a citizen or permanent resident of the United States; rather, at all

times relevant to this litigation, he has been a citizen and resident of Lebanon.  (Declaration of

René Moawad in Support of Motion to Dismiss ("Moawad Decl.") ¶¶ 2-3.)  Further,

Mr. Moawad was in Lebanon when he was served with the Complaint in this action, through

letters rogatory.  (*Id.* ¶ 11; *see also* Docket #21.)

Mr. Moawad's business activity, which involves real estate and tourism, is

concentrated in Lebanon and is not in the United States.  (Moawad Decl. ¶ 5.)  At all times

relevant to this litigation, Mr. Moawad has not directly conducted any business, or been involved

in any commercial transaction, in the United States.  (*Id.* ¶ 4.)  As part of his business,

Mr. Moawad does not solicit or advertise business in the United States, and he does not own,

lease, possess, or otherwise hold any interest in real estate in New York or elsewhere in the

United States.  (*Id.* ¶¶ 9-10.)

Mr. Moawad does not maintain any bank accounts in New York or elsewhere in

the United States and has never had any account with the Wachovia Bank or Chase Manhattan

Bank in New York or with UBS AG Bank in Stamford, Connecticut, which are the

---

[3]    Mr. Moawad may present facts apart from the allegations in the Complaint on his
motions to dismiss for lack of personal and subject matter jurisdiction and for *forum non
conveniens*.  *See* FED. R. CIV. P. 12(b)(1) and 12(b)(2); *cf.* FED. R. CIV. P. 12(b)(6).

correspondent banks referenced in the Complaint.  (*Id.* ¶ 6.)  All of Mr. Moawad's transactions with EDF Man International, Inc., a European financial institution, including the one referred to in paragraph 40 of the Complaint, were handled in Lebanon, not New York, and Chase Manhattan is EDF's bank, not Mr. Moawad's.  (*Id.* ¶ 7)  Likewise, the transfers referred to in paragraphs 39 and 41 of the Complaint were from Mr. Moawad's accounts in Lebanon to his accounts in Europe.  (*Id.* ¶ 8.)  Because Mr. Moawad's funds were in U.S. dollars, the transfers had to go through a correspondent bank in New York (here, Wachovia), a circumstance of which Mr. Moawad was not aware until recently.  (*Id.*)

### Litigation in Lebanon

To the extent that Mr. Moawad has had business dealings with Dr. Ayyash, they have led to a series of pending lawsuits in Lebanon, in which Mr. Moawad is suing Dr. Ayyash for monies owed and Dr. Ayyash is suing Mr. Moawad.  Dr. Ayyash has also sued the other defendants in Lebanon, making many of the same allegations as here, and in one Lebanese case he has made the same attempt as in this case to fuse his grievance against Ms. Koleilat with his business disputes with Mr. Moawad.

Dr. Ayyash admits the Lebanese litigation through the Fortress Global Report he submitted in support of his Ex Parte Motion for Expedited Discovery and an Order of Attachment (Docket ##8-9).[4]  The Report asserts that Dr. Ayyash "has filed some 100 lawsuits freezing $80 - $100 Million of real property connected to Koleilat's scheme to collapse or 'bust

---

[4]     Dr. Ayyash withdrew this motion as to Mr. Moawad as soon as Mr. Moawad's counsel indicated his opposition to that motion and desire to brief it with this motion, absent its withdrawal.  The Court thereafter granted the motion, without opposition, as it applied to the other defendants.  (Docket #16.)  That Order is not a finding on the merits as to Mr. Moawad.

out' the bank." (Report at 13.)[5]  The exhibit referenced in the Report fails to identify 100

lawsuits, but of the 23 it does list, at least eight appear to involve allegations of fraud, forgery, or

theft by Ms. Koleilat, including:  one in which her aunt, Ms. Ayyas, is a co-defendant; another in

which her brothers, Taha and Bassel Koleilat, are co-defendants; and two others in which Taha

Koleilat is sued alone.  (*Id.* Exh. M (Sherwin Decl. Exh. C).)[6]  Dr. Ayyash's exhibit also

indicates that he filed "an action against Rene Emile Moawad, a friend of Rana, to whom she

gave around [illegible] millions American Dollars out of Dr. Adnan Abou Ayyash and the

depositors [*sic*] monies.  Thus we filed an action against him for fraud and obliged him to give

back the monies [illegible]."  (*Id.*)

   The complaints in Dr. Ayyash's Lebanese actions confirm that he is actively

litigating there his claim that fraud by the defendants in this action caused the failure of his

Banks and his losses.  For instance, in a civil complaint filed December 22, 2003, Dr. Ayyash

sued Rana, Taha, and Bassel Koleilat, four other natural persons (but not Mr. Moawad), and Al-

Madina Bank, alleging that they committed fraud in violation of Lebanon's Penal Code Article

655 by stealing $200 million from Dr. Ayyash's account 69911, and demanding return of these

funds as well as attorney's fees.  (Declaration of J. Khoury-Helou in Support of Motion to

Dismiss ("Helou Decl.") ¶ 4 and Exh. A.)  In a separate civil complaint, dated September 21,

2004, Dr. Ayyash sued Ms. Koleilat and Mr. Moawad for fraud in violation of Lebanon's Penal

Code Article 655, alleging that, after the Banks had begun to collapse, they induced him in April

---

[5] For the Court's convenience, a copy of the Report is supplied as Sherwin Decl. Exhibit B.
The Report is rife with innuendo and (at best) multiple hearsay, particularly insofar as it attempts
to link Mr. Moawad to the other defendants and the Banks' failures.  It is apparently correct (and
a binding admission chargeable to Dr. Ayyash) in the one limited manner addressed here.

[6] Like many exhibits to the Fortress Global Report, this list of Dr. Ayyash's lawsuits is
nearly illegible, and the Report does not identify its provenance.  Mr. Moadwad's counsel
requested legible copies of the exhibits, but were told these are the best plaintiff has.

2003 to issue checks for $200 million from his bank in Riyadh to Mr. Moawad in consideration of a promise by Ms. Koleilat to transfer $280 million to Dr. Ayyash.  (*Id.* ¶ 5 and Exh. B.)  These allegations, although differing in some details from the "final fraud" asserted in paragraphs 58-60 of the Complaint herein, and although meritless, clearly show that Dr. Ayyash is able to sue, and has sued, all of the instant defendants in Lebanon for fraud based on his version of the Banks' collapse.

Further, in a civil complaint dated February 22, 2005, and filed after the commencement of the instant action, Dr. Ayyash alleges that in February 2003 he loaned Mr. Moawad $5 million and was not repaid.  (*Id.* ¶ 6 and Exh. C.)  In this complaint, although he mentions his hardships after the bank failures, Dr. Ayyash does not allege fraud or attempt to implicate the Koleilat family.  Instead, he asserts that "the exchange of huge financial amounts between [Dr. Ayyash and Mr. Moawad] became normal" and that Mr. Moawad admitted receiving the $5 million "as part of rebalancing the general debt between them."  (*Id.* Exh. C at 1, 3.)

Although the story of the transactions between Dr. Ayyash and Mr. Moawad (which has led to the filing of complaints in Lebanon by Mr. Moawad as well as by Dr. Ayyash) is not properly the topic of this motion, Dr. Ayyash's reference to it in his recent Lebanese pleading makes clear why Dr. Ayyash has tried, by the thinnest of allegations, to connect his commercial differences with Mr. Moawad to his bank-related litigation with the other defendants:  in order to use improperly as leverage the threat of RICO treble damages in his business dispute with Mr. Moawad.

## ARGUMENT

### I.   THE ACTION SHOULD BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION

This Court does not have subject matter jurisdiction over this controversy, which lacks the significant and material contact with the United States that RICO requires.  The only basis Dr. Ayyash alleges for subject matter jurisdiction over this controversy is that it involves claims under federal law (Compl. ¶ 15), and the only federal law Dr. Ayyash attempts to plead is RICO.  For RICO to apply and for the Court to have subject matter jurisdiction thereunder, however, the alleged conduct either must have occurred in the United States or had sufficient effect in the United States.  Neither of these conditions is met here.

Mindful that RICO "is silent as to any extraterritorial application," courts consider whether "Congress would have wished the precious resources of United States courts and law enforcement agencies to be so devoted" in determining whether they have subject matter jurisdiction over purported RICO disputes among foreign parties.  *North S. Fin. Corp. v. Al-Turki*, 100 F.3d 1046, 1051 (2d Cir. 1996) (citations omitted).  As the Ninth Circuit explained in *Butte Mining PLC v. Smith*, "[w]e do not suppose that Congress in enacting RICO had the purpose of punishing frauds by aliens abroad even if peripheral preparations were undertaken by them here."  76 F.3d 287, 291 (9th Cir. 1996).  Therefore, for this analysis the Second Circuit has adopted alternative tests:  the "conduct test" and the "effects test."  *Al-Turki*, 100 F.3d at 1052.  Dr. Ayyash fails both tests, for which he, as the party invoking the court's subject matter jurisdiction, bears the burden of proof.  *See, e.g.*, *Scelsa v. City Univ. of N.Y.*, 76 F.3d 37, 40 (2d Cir. 1996).

### A.   THE COURT LACKS SUBJECT MATTER JURISDICTION UNDER THE "CONDUCT TEST"

Under the "conduct test," jurisdiction exists only "where conduct material to the completion of the fraud occurred in the United States" and that conduct "directly caused" the loss. *Al-Turki*, 100 F.3d at 1052 (citation omitted). Accordingly, in cases where a foreign plaintiff complains of a foreign transaction with foreign alleged defrauders, courts readily conclude that the controversy lacks "significant and material contact with the United States." *Id.* They reach this conclusion even when the plaintiff alleges a few events that touch the forum with more or less "attenuated" links to the alleged fraud. *See id.* at 1053.

In *Al-Turki*, the Second Circuit held that "the district court was without jurisdiction over a controversy involving foreign victims who sold a foreign entity to foreign defrauders in a foreign transaction lacking significant and material contact with the United States." *Id.* at 1052. Plaintiffs, Panamanian and Dutch corporations that had invested in a French bank, alleged that French investment bankers involved in the bank's sale defrauded them by making various false statements that depressed the sale price, and, after the sale, by transferring funds allegedly payable to plaintiffs from the bank's New York branch to Paris, shutting down the New York branch and altering its books, and not paying plaintiffs. The court concluded that neither the pre- nor post-sale conduct touching the U.S. was material to the fraud. The court notably observed that the post-sale conduct was not material because the "injury to plaintiffs (if any) took place in Paris when [defendants], having received payment of the proceeds of provisioned assets, failed to remit the plaintiffs' share." *Id.* at 1053. Thus, in applying the "conduct test" to a RICO claim in which the predicate wire fraud allegedly consisted of a transatlantic wiring of funds that allegedly should ultimately have been paid to the plaintiff, the court focused not on the happenstance that the funds were located for a time in a

13

New York bank, but on the substantive economic obligation and injury, which were entirely confined to France.

This Court has repeatedly followed *Al-Turki* and dismissed cases for lack of subject matter jurisdiction in analogous circumstances.  For instance, in *OSRecovery, Inc. v. One Groupe International, Inc.*, foreign plaintiffs alleged a RICO claim against foreign defendants based on an international Internet-based Ponzi scheme, but the Court dismissed the claims because they did not allege that the defendants' shipment of debit cards to the U.S., their only U.S.-related conduct, was "material to the fraud or directly caused the losses of the foreign plaintiffs."  354 F. Supp. 2d 357, 367 (S.D.N.Y. 2005) (Kaplan, J.).  Similarly, in *Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP*, a RICO claim based on an alleged conspiracy by mostly foreign defendants to seize control of a foreign bank failed the "conduct test" because all material conduct occurred abroad, despite allegations that the defendants' U.S. affiliates participated.  2004 U.S. Dist. Lexis 24900, at *10 (S.D.N.Y. Dec. 9, 2004) (Daniels, J.). Likewise, in *Nasser v. Andersen Worldwide Societe Cooperative*, where plaintiff shareholders in a Brazilian bank accused a Swiss cooperative of directing fraudulent conduct by its partners in the U.S. and sharing profits with them, the Court dismissed because the material conduct was all alleged to have occurred abroad.  2003 U.S. Dist. Lexis 16710, at *16 (S.D.N.Y. Sept. 24, 2003) (Chin, J.).  As these cases show, this Court recognizes that, even when some movement of assets into the United States or some purported connivance with U.S. citizens is peripherally alleged, such conduct is not material to frauds allegedly perpetrated abroad by foreign parties on foreign victims.

In support of his Ex Parte Motion, Dr. Ayyash cited *Madanes v. Madanes*, 981 F. Supp. 241 (S.D.N.Y. 1997) (Sand, J.), for the proposition that wire transfers to New York

constitute material predicates supporting application of RICO to foreign defendants, but in that case the RICO allegations featured a much higher level of conduct in the forum than here or in the cases discussed above.  In *Madanes*, the Argentine plaintiff sued her siblings as well as a New York-based attorney for wire fraud based on the transfer to accounts in Switzerland of funds the family had kept in New York.  *Id.* at 251.  Clearly those allegations reflect a degree of involvement between this forum and the controversy completely out of proportion to the allegations here, as both defendants and plaintiffs had kept funds in a U.S. bank account, the removal of the funds from that account was the act that parted plaintiff from her property, and an American defendant allegedly "played an integral role in this specific act of fraud."  *Id.*

Here, the conduct alleged has just as little to do with the U.S. as in *Al-Turki* and its progeny.  The asserted fraud was consummated through conduct overwhelmingly in Lebanon, where Ms. Koleilat allegedly induced Dr. Ayyash to transfer $150 million from banks in Europe into Al-Madina Bank and UCB and then "wrongfully diverted" the same funds to herself and her associates in Lebanon.  (Compl. ¶¶ 29-37.)  The only alleged connection between these events and this forum is that thereafter three wire transfers made by Mr. Moawad in October 2002, totaling only $2,060,000, passed through American correspondent banks on their way from Mr. Moawad's accounts at UCB to his accounts at financial institutions in Europe.  (*Id.* ¶¶ 39-41.)  Dr. Ayyash alleges absolutely no other conduct by any defendant in, directed at, or from the United States.[7]  None of the other alleged misconduct, such as Ms. Koleilat's alleged misrepresentations to plaintiff about the contents of her Swiss bank account (*id.* ¶¶ 58-60), is even alleged to have anything to do with the United States.

---

[7]     Dr. Ayyash alleges that one of his own transfers "was made through the Federal Reserve Bank in New York" (Compl. ¶ 36), but this consists solely of Dr. Ayyash's incidental conduct and, as such, is irrelevant to whether defendants' purported racketeering activity gives rise to a controversy over which this Court has subject matter jurisdiction.

These allegations concerning forum-related activity remain limited to conduct peripheral, and not material, to the alleged fraud. That Mr. Moawad allegedly transferred a relatively small amount of funds through international banking channels via New York to other banks, even if properly alleged and demonstrated to be funds of Dr. Ayyash, is not conduct that is "material to the completion of the fraud." That conclusion is highlighted by the fact that those funds could just as easily have been transferred directly to Europe or elsewhere and Dr. Ayyash would not have been one iota more or less injured than he claims to be.

Moreover, the three wire transfers via New York, Dr. Ayyash's sole hook to the United States, should not be credited at all. What minimal significance, if any, they have is due purely to the assertion that those funds are a small part of the proceeds of the purported fraud (Compl. ¶ 42), something Mr. Moawad strongly disputes. But Dr. Ayyash's assertion is made on "information and belief," unsupported by the necessary allegations of the facts upon which that belief is founded. (*Id.*) That assertion should therefore be disregarded. *See Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655, 664 (2d Cir. 1997) (fraud claim may not be pled on information and belief except as to facts peculiarly within defendants' knowledge, and then only if plaintiff states facts upon which the belief is founded). Even the Fortress Global Report goes no further. After mentioning Mr. Moawad's transfer to EDF Man, the Report asserts only that "[i]nformation was received that Rene Moawad has a history in Beirut for bank fraud." (Report at 7.) No attempt whatsoever is made to indicate who received this "information," or from whom, or what the details were, much less to show a basis that the funds transferred actually were the proceeds of a fraud against plaintiff. Dr. Ayyash cannot meet his burden of proof on a motion to dismiss for lack of subject matter jurisdiction simply by asserting

by fiat that he is the rightful owner of funds that Mr. Moawad kept in his account in one of Dr. Ayyash's own Banks.

In sum, Dr. Ayyash cannot establish subject matter jurisdiction under the "conduct test" because the acts that allegedly harmed Dr. Ayyash were performed by Ms. Koleilat in Lebanon and none of the material acts had any connection with the U.S.

### B.   THE COURT LACKS SUBJECT MATTER JURISDICTION UNDER THE "EFFECTS TEST"

The "effects test" requires the plaintiff to demonstrate that the "foreign transaction has substantial effects" in the U.S.  *Al-Turki*, 100 F.3d at 1052.  There is no cognizable effect in the United States based upon a foreign plaintiff losing money.  *See, e.g.*, *OSRecovery*, 354 F. Supp. 2d at 367 (no effect in the U.S. when a foreign plaintiff loses money); *Nuevo Mundo*, 2004 U.S. Dist. Lexis 24900, at *11 (no U.S. effect where plaintiff was foreign and injury to unspecified U.S. investors was vague and conclusory).

Because Dr. Ayyash is not a U.S. citizen or resident and does not even attempt to allege an impact here, he plainly cannot establish that the alleged fraud against him at the Banks in Lebanon had sufficient effect in the U.S. to justify the exercise of this Court's jurisdiction.

## II.   THE ACTION SHOULD BE DISMISSED FOR LACK OF PERSONAL JURISDICTION OVER MR. MOAWAD

This Court only has personal jurisdiction over Mr. Moawad if jurisdiction is authorized by RICO or the applicable New York long-arm statute, and then only if the exercise of jurisdiction is compatible here with the requirements of the Due Process Clause.  The venue and process provision of RICO does not apply, however, because Mr. Moawad was not served with process in the United States (in fact, no defendant was).  (Point II.A.)  The New York long-arm statute also does not apply because Mr. Moawad does not reside or do business in New York, did not transact business here with a "substantial relationship" to the claims asserted, is not

alleged to have committed a tort in New York, and is not alleged to have committed a tort

without the state that caused injury within New York.  (Point II.B.)  Further, Mr. Moawad's

contacts with this forum are so sparse that in any event the exercise of personal jurisdiction over

him would be incompatible with due process.  (Point II.C.)

### A.   THE RICO LONG-ARM PROVISION DOES NOT APPLY BECAUSE MR. MOAWAD WAS NOT SERVED IN THE UNITED STATES

The only federal statute that could conceivably authorize personal jurisdiction

here is the venue and process provision of RICO, which provides, in relevant part, that:

> (a)  Any civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs.

> (b)  In any action under section 1964 of this chapter in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.

18 U.S.C. § 1965.  Section 1965(a) "grants personal jurisdiction over an initial defendant in a

civil RICO case to the district court for the district in which that person resides, has an agent, or

transacts his or her affairs.  In other words . . . where personal jurisdiction based on minimum

contacts is established as to at least one defendant."  *P.T. United Can Co. v. Crown Cork & Seal

Co.*, 138 F.3d 65, 71 (2d Cir. 1998).  If the court has jurisdiction over one defendant under

§ 1965(a), then § 1965(b) provides for national service of process on other defendants but only if

the "ends of justice" so require.  *Id.*

Section 1965(a), on its face, provides for jurisdiction only over persons in a

"district" in the U.S. and has no provision for international service of process.  Courts have

therefore concluded that "a foreign party against whom a RICO claim is asserted must be served

with process in this country."  *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*,

26 F. Supp. 2d 593, 601 (S.D.N.Y. 1998) (Scheindlin, J.) (dismissing foreign RICO defendant that was not served in the U.S.); *Shaw v. Rolex Watch U.S.A., Inc.*, 745 F. Supp. 982, 987 (S.D.N.Y. 1990) (Conner, J.) (same); *Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 709 F. Supp. 1279, 1285 (S.D.N.Y. 1989) (Lasker, J.) (same); *Nordic Bank PLC v. Trend Group, Ltd.*, 619 F. Supp. 542, 564 (S.D.N.Y. 1985) (Goettel, J.) (same).

A few courts have questioned the construction of Section 1965(a) set forth in *Laborers*, *Shaw*, and similar cases, reasoning that "Congress hardly would have immunized from RICO liability the foreign-based co-conspirators of a racketeering enterprise that conducts its activities here and that injures persons here." *Biofeedtrac, Inc. v. Kolinor Optical Enters. & Consultants, S.R.L.*, 817 F. Supp. 326, 332 (E.D.N.Y. 1993) (Nickerson, J.). However, cases like *Biofeedrac* stand at most for the uncontroversial proposition that, if a plaintiff cannot serve process and establish jurisdiction pursuant to § 1965(a) because the defendant is abroad, he may still be able to do so pursuant to the applicable state long-arm statute. *See id.* at 333-34 (applying CPLR 301 and 302).[8]

Further, § 1965(b) cannot create jurisdiction when no defendant is subject to jurisdiction under § 1965(a). *See* 18 U.S.C. § 1965(b); *PT United*, 138 F.3d at 71-72 (noting that "Congress has expressed a preference in § 1965 to avoid, where possible, haling defendants into far flung fora"). And even then, according to the plain language of § 1964(b), service must still be made with the United States. 18 U.S.C. § 1965(b).

---

[8]     In fact, even where defendants are not located abroad and may be served under § 1965(a), courts conclude that that section requires at least the same level of forum contacts required by CPLR 302. *See, e.g.*, *Anderson v. Indiana Black Expo, Inc.*, 81 F. Supp. 2d 494, 505 (S.D.N.Y. 2000) (Sweet, J.) (after determining that execution of contract in New York was insufficient contact to support jurisdiction under the long-arm statute, the court rejected jurisdiction under § 1965(a) for the same reasons).

Here, Mr. Moawad was served in Lebanon rather than the United States. (Moawad Decl. ¶ 11; Sherwin Decl. Exh. E.)  This in itself precludes the Court from exercising personal jurisdiction over him under § 1965(a).  Moreover, as set forth more fully below, Mr. Moawad's contacts with the forum are insufficient to satisfy the requirements of the applicable New York long-arm statute or of the Due Process Clause.  Further, all of the defendants who have been served were also served in Lebanon and are not subject to personal jurisdiction under § 1965(a).  Thus, this is not a RICO case in which the forum contacts of other defendants would support the assertion of jurisdiction over a defendant without such contacts to serve the "ends of justice" through service elsewhere in the United States.

### B. THE COURT LACKS PERSONAL JURISDICTION UNDER NEW YORK'S LONG-ARM STATUTE

#### 1. CPLR 301 – General Personal Jurisdiction

The Court does not have general personal jurisdiction over Mr. Moawad because he is a nonresident who does not regularly transact business in New York.

CPLR 301 provides that a "court may exercise such jurisdiction over persons, property, or status as might have been exercised heretofore."  CPLR 301.  This is construed to provide general personal jurisdiction over a nonresident only if it is "doing business" in New York, which means "it conducts, or purposefully directs, business not occasionally or casually, but with a fair measure of permanence and continuity."  *Anderson v. Indiana Black Expo, Inc.*, 81 F. Supp. 2d 494, 500 (S.D.N.Y. 2000) (Sweet, J.) (internal quotations omitted). For example, in *Anderson*, this Court concluded that a nonresident defendant who did not buy or sell goods in, derive income from, maintain bank accounts in, own or lease real property in, solicit business or advertise in, or otherwise maintain a presence in New York was not "doing business" here under CPLR 301.  *Id.*

Establishing that Mr. Moawad's business activities in New York have permanence and continuity is a demanding test, which Dr. Ayyash cannot meet.  Mr. Moawad is not, and has never been, a citizen or permanent resident of the United States.  (Moawad Decl. ¶ 2.)  Mr. Moawad's business activity, which involves real estate and tourism, is concentrated in Lebanon and not the United States, and at all times relevant to this litigation he has not directly conducted any business, or been involved in any commercial transaction, in the United States. (*Id.* ¶¶ 4-5.)  As part of his business, Mr. Moawad does not solicit or advertise business in the United States, and he does not own, lease, possess, or otherwise hold any interest in real estate in New York or elsewhere in the United States.  (*Id.* ¶¶ 9-10.)  Mr. Moawad is thus not "doing business" in New York sufficient to find general personal jurisdiction under CPLR 301.

## 2.     CPLR 302 – Specific Personal Jurisdiction

The Court also does not have specific jurisdiction over Mr. Moawad under CPLR 302 because he has not transacted business here with a substantial relationship to Dr. Ayyash's causes of action, has not committed the asserted torts in New York, and has not committed the asserted torts without New York such that he caused injury to Dr. Ayyash in New York.

CPLR 302(a) provides, in relevant part, that:

> As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:
> 1.      transacts any business within the state or contracts anywhere to supply goods or services in the state; or
> 2.      commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or

3.      commits a tortious act commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce . . . .

CPLR 302(a).  Plaintiff cannot satisfy any of these standards.

a.      CPLR 302(a)(1) – Transacting Business

Specific personal jurisdiction under CPLR 302(a)(1) requires that the defendant transact business in New York and that there be a "substantial nexus" between his in-state activities and the transaction from which the cause of action arises.  *See Anderson*, 81 F. Supp. 2d at 501.  Tangential activities are insufficient.  In particular, courts have consistently held that wiring funds into a New York bank account does not satisfy the standard for "transacting business" under CPLR 302(a)(1).  This holds regardless of whether the defendant transfers its own funds or is a bank transferring customer funds.

For instance, in *Continental Field Service Corp. v. ITEC International, Inc.*, this Court found no personal jurisdiction over an out-of-state corporation that wired funds to plaintiff's New York account in connection with services performed abroad.  894 F. Supp. 151, 154 (S.D.N.Y. 1995) (Parker, J.).  Similarly, in *Daewoo International (America) Corp. Creditor Trust v. Orion Engineering & Service Inc.*, this Court found no personal jurisdiction over the defendant in an action based on a loan between Korean companies, even though funds were disbursed from, and interest was paid to, a New York bank account.  2003 U.S. Dist. Lexis 18696, at *6 (S.D.N.Y. Oct. 20, 2003) (Duffy, J.).

The same principle has been applied in RICO cases.  Examples include *Dale v. Banque SCS Alliance S.A.*, where this Court concluded that it had no personal jurisdiction over a

foreign bank from which funds were allegedly fraudulently wired to a New York bank, 2004 WL
2389894, at *5 (S.D.N.Y. Oct. 22, 2004) (Fox, M.J.), and *Casio Computer Co. v. Sayo*, where
this Court concluded that the foreign RICO defendants' wire transfers into accounts in New York
did not provide sufficient contacts to support personal jurisdiction, 2000 WL 1877516, at *26
(S.D.N.Y. Oct. 13, 2000).  No court to our knowledge has ever found that wiring funds from one
foreign bank, through a U.S. correspondent bank, and on to another foreign bank is sufficient for
jurisdiction under CPLR 302(a)(1).

      Because Mr. Moawad's only alleged contact with New York in connection with
this action is the passage of funds *through* New York banks on their way to Europe, Dr. Ayyash
cannot establish personal jurisdiction over Mr. Moawad under CPLR 302(a)(1).

b.    <u>CPLR 302(a)(2) – Tortious Act Within the State</u>

      CPLR 302(a)(2) does not provide jurisdiction over Mr. Moawad because he was
not physically present in New York when he took any alleged tortious act.

      CPLR 302(a)(2) provides personal jurisdiction over a defendant who "commits a
tortious act within the state," if the cause of action arises out of that act.  On its face, this section
requires the defendant to be physically present in the state when committing the tort.  *See, e.g.*,
*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 790 (2d Cir. 1999) (no
jurisdiction under CPLR 302(a)(2) where defendant was not physically in state when tort
occurred); *Bensusan Rest. Corp. v. King*, 126 F.3d 25, 29 (2d Cir. 1997) (same); *Baptichon v.
Nevada State Bank*, 304 F. Supp. 2d 451, 459 (E.D.N.Y. 2004) (Mann, M.J.) (same, where claim
was based on presentation of check to New York bank for payment), *adopted*, 304 F. Supp. 2d
451, *aff'd*, 125 Fed. Appx. 374 (2d Cir. 2005); *Team Obsolete Ltd. v. A.H.R.M.A. Ltd.*, 2002 U.S.
Dist. Lexis 10737, at *11 (E.D.N.Y. Mar. 15, 2002) (Glasser, J.) (same, where RICO claim was
based on defendant's mailings into New York); *see also Dale*, 2004 WL 2389894, at *7 (illegal

23

receipt in New York of funds was "merely the taking of a step in furtherance of the commission of a tortious act," rather than the full tortious act required by CPLR 302(a)(2)).

Dr. Ayyash does not allege that Mr. Moawad was physically present in New York when he committed any purportedly fraudulent act, so the Court does not have personal jurisdiction over him based on CPLR 302(a)(2).

> c.   CPLR 302(a)(3) – Tortious Act Without / Injury Within the State

The Court also does not have jurisdiction over Mr. Moawad under CPLR 302(a)(3).  CPLR 302(a)(3) is triggered only when a defendant "commits a tortious act without the state causing injury . . . within the state."  Facially, Dr. Ayyash's allegations do not satisfy the statutory requirements.  Dr. Ayyash does not allege that any of the tortious conduct in Lebanon caused him injury in New York.  Additionally, as shown above, he also does not and cannot allege that Mr. Moawad does business here, expects his acts to have consequences here, or meets any of the other requirements of CPLR 302(a)(3)(i) or (ii).

## C.   THE EXERCISE OF PERSONAL JURISDICTION OVER MR. MOAWAD WOULD VIOLATE THE DUE PROCESS CLAUSE

Moreover, the exercise of personal jurisdiction over Mr. Moawad under any of the statutes reviewed above is precluded by the Due Process Clause because it would offend "traditional notions of fair play and substantial justice."  *Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102, 113 (1987) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  In *Asahi*, the Supreme Court found that the assertion of jurisdiction over a Japanese manufacturer sued for indemnification by a Chinese manufacturer was unreasonable and unfair given the minimal nature of the defendant's contacts with the forum state and of the state's interest in the dispute.  The Supreme Court held that a court determining the reasonableness of the exercise of jurisdiction under a statute:

24

must consider the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief.  It must also weigh in its determination the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interests of the several States in furthering fundamental substantive social policies.

*Id.* (internal citation omitted).[9]

Here, these factors preclude the exercise of personal jurisdiction over Mr. Moawad, even if a statute provided for it.  The burden on Mr. Moawad of litigating in the United States, where he does not reside or do business, and which has nothing to do with his dispute with Dr. Ayyash, is enormous.  This forum also has no interest in policing frauds allegedly perpetrated in Lebanon, and, although Dr. Ayyash evidently believes that a RICO action in the United States will give him the greatest leverage against the various defendants, he can seek, and is seeking, relief in Lebanon.  (*See* Point III, below.)  Further, the systemic interest of the United States courts in leaving such a case as this to be resolved in the country where the underlying facts occurred is self-evident.

In sum, any assertion of personal jurisdiction over Mr. Moawad on this dispute is incompatible with our fundamental notions of due process.

## III.   THE ACTION SHOULD BE DISMISSED ON THE GROUND OF *FORUM NON CONVENIENS*

The *forum non conveniens* analysis also compels dismissal here.  To grant a motion to dismiss for *forum non conveniens*, a court must determine whether an adequate alternative forum exists, determine the degree of deference to give to the plaintiff's choice of forum, and balance the public- and private-interest factors.  *Iragorri v. United Techs. Corp.*, 274

---

[9]      This Court readily applies Fourteenth Amendment analyses and authorities in the Fifth Amendment context, as when RICO claims are asserted against foreign defendants.  *See, e.g.*, *Daventree Ltd. v. Republic of Azerbaijan*, 349 F. Supp. 2d 736, 760 (S.D.N.Y. 2004) (Stein, J.) (noting application of Fourteenth Amendment authorities and dismissing RICO claim against foreign individual defendants for lack of personal jurisdiction).

F.3d 65, 73 (2d Cir. 2001) (*en banc*); *Carey v. Bayerische Hypo-Und Vereinsbank AG*, 370 F.3d

234, 237 (2d Cir. 2004) (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 (1981), and *Gulf

Oil v. Gilbert*, 330 U.S. 501, 508-09 (1947)).

  First, Lebanon provides a more than adequate alternative forum, as shown by

Dr. Ayyash's choice to bring lawsuits there against Mr. Moawad and the other defendants,

alleging many of the same facts he alleges here.  Second, Dr. Ayyash's choice of forum in this

case is entitled to no deference, as every factor demonstrates that this case has no bona fide

connection with this forum, which was obviously chosen purely for tactical and forum-shopping

reasons.  Third, the private-interest factors overwhelmingly favor resolving the dispute in

Lebanon, where the parties, witnesses, and evidence are concentrated, and the public-interest

factors also favor a Lebanese forum because only Lebanon, and not New York, has an interest in

deciding under Lebanese law a dispute among Lebanese citizens about the collapse of two

Lebanese banks.

### A. THE LITIGATION MAY BE CONDUCTED IN LEBANON

  By his own acts, Dr. Ayyash has demonstrated conclusively that Lebanese courts

provide an adequate alternative forum for this dispute, because he is suing Mr. Moawad and the

other defendants there now, making many of the same allegations as in his Complaint here.

  The requirement of an alternative forum is ordinarily "satisfied when the

defendant is 'amenable to process' in the other jurisdiction."  *Piper*, 454 U.S. at 255 n.22 (citing

*Gilbert*, 330 U.S. at 506-507).  Once this element is established, the rest of the adequacy inquiry

is simple.  The court must merely make sure that "the remedy provided by the alternative forum"

is not "so clearly inadequate or unsatisfactory that it is no remedy at all."  *Id* at 254.  This is a

low hurdle for defendants because courts should not give "substantial weight" to the possibility

that the law of the alternative forum is less advantageous to the plaintiff.  *Id.* at 250.

Accordingly, the test is whether the alternative forum provides "adequate, not identical" relief. *PT United*, 138 F.3d at 74. In particular, it does not matter whether the alternative forum has a statute comparable to (or as potent as) civil RICO; the existence of a cause of action for fraud is sufficient. *See id.* (Indonesian fraud cause of action was an adequate substitute for RICO); *Base Metal Trading SA v. Russian Aluminum*, 253 F. Supp. 2d 681, 701 (S.D.N.Y. 2003) (Koeltl, J.) (even though parties disputed whether Russian law provided an available cause of action for fraud, court concluded that statutory provisions "for damages and . . . unjust enrichment" were an adequate substitute for RICO), *aff'd*, 98 Fed. Appx. 47 (2d Cir. 2004).

The requirements for an adequate alternative forum are readily satisfied here. First, Dr. Ayyash cannot dispute that defendants, who reside in Lebanon (Compl. ¶¶ 7-13), are amenable to process there. Indeed, his first step in this Court was to seek letters rogatory in order to serve defendants in Lebanon. (Docket ##3-5.) Dr. Ayyash also proved that by having already *commenced* civil actions against Mr. Moawad and the other defendants in Lebanon based on some of the same allegations he has made here. (Helou Decl. ¶¶ 4-6 and Exhs. A-C; *see also* Report at 8, 20 and Exh. M (Sherwin Decl. Exh. C).)

Further, Dr. Ayyash's Lebanese complaints show that Lebanon provides at least adequate causes of action. Indeed, Lebanese law provides a civil remedy for fraud (Helou Decl. ¶ 7), and Dr. Ayyash cannot deny that his Lebanese actions against Mr. Moawad and the other defendants sound in fraud and are based on the same or similar allegations as his Complaint. Dr. Ayyash's fraud-based claims here also would not be barred by the statute of limitations were he to bring them now in Lebanon or add them to his pending suits there. (*Id.* ¶ 8.) Consequently, Lebanon is an adequate alternate forum.

Judging from Dr. Ayyash's Ex Parte Motion, he will probably attempt to challenge the quality of the judicial process available to him in Lebanon by using hearsay once again to suggest that (1) the recent withdrawal of Syrian troops from Lebanon (though almost universally applauded) has actually created a "chaotic political climate," and (2) defendants "have close ties with Syrian officials and pro-Syrian forces inside Lebanon." (Report at 4.) The logical disconnect between these two propositions is self-evident: if, indeed, defendants had Syrian patrons, now would be the best time in years to sue them in Lebanon.

Regardless, "considerations of comity preclude a court from adversely judging the quality of a foreign justice system absent a showing of inadequate procedural safeguards, so such a finding is rare." *PT United*, 138 F.3d at 73 (internal citation omitted). Moreover, this Court has long recognized the adequacy of the Lebanese judicial system. *See Ismail v. Am. Univ. of Beirut*, 246 F. Supp. 2d 330, 333 (S.D.N.Y. 2003) (Marrero, J.); *Gibbon v. Am. Univ. of Beirut*, 1983 U.S. Dist. Lexis 13401, at *13 (S.D.N.Y. Sept. 27, 1983) (Goettel, J.). In *Gibbon*, the Court made short work of exactly the same kind of assertions about "turmoil" in Lebanon as those Dr. Ayyash appears ready to make, observing that, "[i]f such conditions alone were to justify an alien's substitution of a forum in the United States for that of his local government, then the already over-burdened judicial system of this country would be deluged with foreign disputes." 1983 U.S. Dist. LEXIS 13401, at *14 n.9. Since then, conditions have improved in Lebanon, rendering an attack on the Lebanese judicial system even less tenable: the "Court's findings in *Gibbon* relevant to prevailing conditions in 1983, when Lebanon was torn by civil strife, persuasively argues in favor of a determination that Lebanon remains an adequate alternate forum today." *Ismail*, 246 F. Supp. 2d at 333.

Thus, Lebanon is an adequate alternative forum.

**B.     PLAINTIFF'S CHOICE OF FORUM IS ENTITLED TO NO DEFERENCE**

Dr. Ayyash's choice of a New York forum is entitled to no deference because it is clear that he is forum shopping and not acting out of his own interests of convenience.

The Second Circuit explained *en banc* in *Iragorri* that:

> the greater the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum of choice and the more it appears that considerations of convenience favor the conduct of the lawsuit in the United States, the more difficult it will be for the defendant to gain dismissal for *forum non conveniens.* Thus, factors that argue against *forum non conveniens* dismissal include the convenience of the plaintiff's residence in relation to the chosen forum, the availability of witnesses or evidence to the forum district, the defendant's amenability to suit in the forum district, the availability of appropriate legal assistance, and other reasons relating to convenience or expense.  On the other hand, the more it appears that the plaintiff's choice of a U.S. forum was motivated by forum-shopping reasons – such as attempts to win a tactical advantage resulting from local laws that favor the plaintiff's case, the habitual generosity of juries in the United States or in the forum district, the plaintiff's popularity or the defendant's unpopularity in the region, or the inconvenience and expense to the defendant resulting from litigation in that forum – the less deference the plaintiff's choice commands and, consequently, the easier it becomes for the defendant to succeed on a *forum non conveniens* motion by showing that convenience would be better served by litigating in another country's courts.

274 F.3d at 72.  Applying those factors, courts routinely hold that the choice of a United States forum by a nonresident plaintiff is entitled to little deference.  *Piper*, 454 U.S. at 255-56.  *See also Base Metal*, 253 F. Supp. 2d at 694, 698 ("[l]ittle deference should be given to the plaintiffs' choice of forum" where most plaintiffs were not U.S. residents or citizens; such "forum shopping is the antithesis of the bona fide connection to the plaintiffs' chosen forum that would cause the Court to defer" to their choice).

Here, Dr. Ayyash's actions have all of the earmarks of a case brought in New York solely "for forum-shopping reasons."  First, and very importantly, Dr. Ayyash is not a United States citizen or a resident of New York, but rather a citizen of Lebanon and a resident of Saudi Arabia.  (Compl. ¶ 6.)  Thus, his own convenience is not advanced by suing in New York.

Second, the availability of witnesses and evidence is also a factor that clearly demonstrates that, *Id* New York was not chosen out of convenience.  All of the defendants are in Lebanon.  (*Id.* ¶¶ 7-13.)  Third-party witnesses and evidence are also concentrated in Lebanon, where the Banks are located and the frauds allegedly occurred, and may not be available in New York.  One probable Lebanese witness is Lebanese Central Bank governor Riad Salameh, who was involved in investigating the Banks and may be knowledgeable about whether documents issued under his name were in fact forged.  (*Id.* ¶ 29.)  Another witness is Dr. Ayyash's brother Ibrahim, who co-owned and managed Al-Madina Bank and hired Ms. Koleilat.  (*Id.* ¶¶ 18, 21.)[10] No witnesses or evidence are located in New York.

Third, New York is also manifestly inferior to Lebanon with respect to the amenability of the parties to suit, as the defendants are all citizens and residents of Lebanon. (*Id.* ¶¶ 7-13.)  If Dr. Ayyash were acting out of convenience or bona fide reasons, he would have brought his claims only in Lebanon where all defendants are readily amendable to service and not here where letters rogatory had to be issued.  Also, as shown in Point II above, Mr. Moawad is not amenable to suit here, and the other defendants appear to have just as little to do with New York and the United States as he does.

Fourth, as for the availability of appropriate legal assistance, by his actions, Dr. Ayyash admits that he has Lebanese counsel who are able to conduct scores of lawsuits on his behalf concerning the very same fraud asserted here.

---

[10]    Unlike plaintiff, who *owns* Al-Madina Bank, and Ms. Koleilat, who *worked for plaintiff* at that bank, Mr. Moawad was never an employee or owner of the bank and has no knowledge of its inner workings.  Therefore, he is currently unable to identify bank employees by name, though it seems safe to say that discovery involving such persons would be necessary and would be concentrated in Lebanon.

Fifth, the principal attraction of this forum to Dr. Ayyash is obviously the threat to defendants of treble damages under RICO, combined with the tactical advantages of discovery under the Federal Rules of Civil Procedure.

Sixth, if he wished to subject his adversaries to "inconvenience and expense," Dr. Ayyash could hardly have chosen a forum better suited to that purpose than New York, given its distance from Lebanon, where defendants reside.

In short, there is no conceivable basis on which this foreign plaintiff can argue that his claims relating to a Lebanese bank scandal have any "bona fide connection" to this forum, and accordingly Dr. Ayyash's choice of forum should be afforded no deference at all.

## C.   DISMISSAL IS IN THE PRIVATE AND PUBLIC INTEREST

Both the private-interest factors, such as the convenience of the parties and witnesses, and the public-interest factors, including the interests of the possible forums in adjudicating the dispute, strongly balance in favor of dismissal and would do so even if Dr. Ayyash's choice of forum received some deference.

### 1.   Private-Interest Factors

The convenience of the parties and witnesses, and other private-interest factors, overwhelmingly favor dismissal, because, as demonstrated above, a Lebanese forum would much better accommodate each of these interests.

The private-interest factors that courts must consider on a motion to dismiss for *forum non conveniens* include:  "the interests of the litigants in having the case tried in a particular forum; the relative ease of access to sources of proof; the availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; the possibility of a view of relevant premises, if such a view would be appropriate to the action;

31

and all other practical problems that make trial of a case easy, expeditious and inexpensive."
*Carey*, 370 F.3d at 237 (citing *Gilbert*, 330 U.S. at 508).

Here, the convenience of all defendants plainly would be better served by litigation in Lebanon where the defendants reside (Compl. ¶¶ 7-13), than in New York where they are not present.  Litigation in Lebanon would also clearly be more convenient to Dr. Ayyash because he is a Lebanese citizen and lives in Saudi Arabia, which is much closer to Lebanon than New York.  Further, in Lebanon, all of the parties can testify in their native Arabic, rather than in English or through an interpreter.

Ease of access to the sources of proof in this case also strongly favors a Lebanese forum because the documentary evidence is in Lebanon, such as the Banks' records and correspondence.  No evidence is in New York or the United States.

Moreover, the relevant documents are in Arabic and would have to be translated into English at considerable expense to the parties, a factor that counsels for dismissal.  *See, e.g.*, *Schertenleib v. Traum*, 589 F.2d 1156, 1165 (2d Cir. 1978) (translation costs a relevant factor in *forum non conveniens* inquiry); *Monsanto Int'l Sales Co. v. Hanjin Container Lines, Ltd.*, 770 F. Supp. 832, 836 (S.D.N.Y. 1991) (Wood, J.) (same).  The volume of Arabic documents in evidence would increase substantially if Mr. Moawad, finding himself bound to litigate here, brought counterclaims based on his other transactions with Dr. Ayyash.  More importantly, the trier of fact may ultimately have to decide whether a given document – such as the Arabic letter, dated November 5, 2002, that Dr. Ayyash attached to his Ex Parte Motion (Sherwin Decl. Exh. D) – was, indeed, forged.  In that inquiry no amount of expert testimony could take the place of the trier's inspection of original documents in his or her own language.

Both the availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses also weigh in favor of a Lebanese forum and against New York.  As noted above, it is likely that the parties will require the testimony of third-party witnesses familiar with events at Al-Madina Bank and UCB, such as the employees of the Banks and the governor of the Lebanese Central Bank.  Such persons, if unwilling to testify, are beyond the subpoena power of this Court, and, if willing, will doubtless prefer not to incur the inconvenience of a flight to New York.  This circumstance also favors dismissal.  *See, e.g.*, *ACLI Int'l Commodity Servs., Inc. v. Banque Populaire Suisse*, 652 F. Supp. 1289, 1298 (S.D.N.Y. 1987) (Lasker, J.) (dismissal in view of court's inability to compel testimony by witnesses with first-hand knowledge of bank fraud).

In sum, the private-interest factors weigh heavily in favor of dismissal.

### 2.    Public-Interest Factors

The public-interest factors also strongly support dismissal.  These factors include "court congestion; the interest of forums in having local disputes decided at home; and the interest in having issues of law decided by courts of the nation whose law is involved."  *Carey*, 370 F.3d at 237 (citing *Gilbert*, 330 U.S. at 508-09).

The interest of forums in having local disputes decided at home weighs heavily in favor of dismissal.  This is a local Lebanese dispute, in which Lebanon is very interested and the United States is not at all interested.  Exactly as in *Ismail*, Dr. Ayyash "describe[s] a quintessentially local dispute predominantly centered in Lebanon and that is governed by Lebanese law.  Lebanon has a strong interest in permitting its legal system to resolve private disputes among residents and institutions located in Lebanon involving injuries that occurred there."  246 F. Supp. 2d at 334.  *See also Base Metal*, 253 F. Supp. 2d at 713 (Russia's interest in resolving dispute involving alleged scheme to take over Russian companies, and involving the

alleged illegal involvement of high level Russian politicians, presented issues "that should be resolved by the Russian courts").  Dr. Ayyash's asserted RICO scheme is not even alleged to have been masterminded or run out of New York or had any effect here.  There is simply nothing about this case that justifies burdening a New York jury with the task of deciding it, when Lebanese courts are capable of deciding exactly such cases as this.

The interest in having issues of law decided by courts of the nation whose law is involved also weighs in favor of dismissal.  The law applicable to Dr. Ayyash's state-law claims for fraud, conversion, breach of fiduciary duty, and negligence (Courts III-VI) is obviously that of Lebanon.  For this Court to determine, apply, and instruct on Lebanese law would involve the cumbersome process of having Lebanese legal experts opine on the meaning of a civil code written in Arabic.  This factor, too, favors dismissal.  *See, e.g.*, *Schertenleib*, 589 F.2d at 1165 (noting that "the uncertain and time-consuming task of resolving" questions of foreign law "by an American judge unversed in civil law tradition" supported dismissal); *Base Metal*, 253 F. Supp. 2d at 712 (same); *Panama Processes, S.A. v. Cities Serv. Co.*, 500 F. Supp. 787, 798 (S.D.N.Y. 1980) (Haight, J.) (same), *aff'd*, 650 F.2d 408 (2d Cir. 1981).

Thus, the public-interest factors also strongly favor dismissal.  The result of the *forum non conveniens* analysis is clear:  this action should be dismissed in favor of Lebanon.

## IV.    THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO STATE A CAUSE OF ACTION

Dr. Ayyash's substantive RICO claim should be dismissed because he failed adequately to plead any predicate acts (Point IV.A) and also failed to allege a pattern of racketeering activity (Point IV.B).  Given that the substantive RICO claim fails, the RICO conspiracy claim should also be dismissed.  (Point IV.C.)  Because Dr. Ayyash thus has no viable claim under federal law, the Court should not exercise supplemental jurisdiction over his

remaining Lebanese-law claims, including the fraud claim he asserts against Mr. Moawad. (Point IV.D.)

### A. THE RICO CLAIM SHOULD BE DISMISSED BECAUSE DR. AYYASH FAILED TO PLEAD ADEQUATELY ANY PREDICATE ACTS

The RICO claim should be dismissed because Dr. Ayyash did not adequately plead two or more of predicate acts of wire fraud and money laundering. The only predicates Dr. Ayyash tried to plead were wire fraud (Compl. ¶¶ 38-43), together with money laundering allegations that merely repeat the wire fraud allegations and add some theatrical references to shadowy, unspecified transactions with Hezbollah and the Central Bank of Iraq (*id.* ¶¶ 44-52). However, the alleged use of the U.S. wires is not even an incident to an essential part of the asserted scheme, so both the wire fraud predicate acts and as the derivative money laundering predicate acts fail as a matter of law.

RICO requires a plaintiff to prove a "pattern of racketeering activity" comprised of at least two predicate acts. 18 U.S.C. § 1961(5). When the asserted predicate acts consist of mail or wire fraud, the plaintiff must plead each such racketeering predicate with the particularity Rule 9(b) of the Federal Rules of Civil Procedure requires of all fraud claims. *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 179-80 (2d Cir. 2004); *Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655, 664 (2d Cir. 1997). The plaintiff must thus "state the contents of the communications, who was involved, where and when they took place, and explain why they were fraudulent." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993). The court should disregard any asserted predicate act that is not pled with particularity. *Id.*

Moreover, courts scrutinize civil RICO complaints searchingly and in particular "look with a jaundiced eye upon allegations of fraud based upon information and belief."

*Furman v. Cirrito*, 828 F.2d 898, 900 (2d Cir. 1987). The court need not accept as true the

plaintiff's unwarranted deductions of fact or conclusions of law, and "[t]his principle applies

with even greater force in a fraud case governed by the more stringent pleading requirements of

Fed. R. Civ. P. 9(b)." *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 771 (2d Cir.

1994), *cert. denied*, 513 U.S. 1079 (1995). *Accord Dubai Islamic Bank v. Citibank, N.A.*, 256

F. Supp. 2d 158, 163 (S.D.N.Y. 2003) (Berman, J.). Further, allegations of fraud cannot be

based on information and belief, except as to matters peculiarly within the defendant's

knowledge and even then the plaintiff must state in the complaint the facts upon which his belief

is founded. *First Capital*, 385 F.3d at 179; *Campaniello*, 117 F.3d at 664.

In addition, a plaintiff must sufficiently allege each of the elements of the asserted

predicate acts. When the predicate act is wire fraud, the elements are: (1) the existence of a

scheme to defraud; (2) the defendant's knowing participation the scheme; and (3) use of the

wires in interstate or foreign commerce to further the scheme. 18 U.S.C. § 1343; *Chanayil v.

Gulati*, 169 F.3d 168, 170-71 (2d Cir. 1999). A RICO plaintiff must show a causal connection

between his asserted injury and the predicate act – that he suffered his claimed injury as a result

of the violations of the wire fraud statute and not due to some other asserted wrongdoing that

does not constitute a RICO predicate act. *First Nationwide*, 27 F.3d at 767; *Hecht v. Commerce

Clearing House, Inc.*, 897 F.2d 21, 23 (2d Cir. 1990). It follows that the wiring element (like the

mailing element in mail fraud) must be at least an "incident to an essential part of the scheme."

*United States v. Altman*, 48 F.3d 96, 102 (2d Cir. 1995) (citation omitted) (dismissing RICO

claim because mailing that occurred after scheme reached fruition was not an incident to any

essential part of the scheme); *Price v. Gast*, 2000 U.S. Dist. Lexis 4552, at *19-20 (S.D.N.Y.

Apr. 11, 2000) (Sand, J.) (same, with wire fraud).  The same is true for money laundering, which requires underlying "unlawful activity."  18 U.S.C. § 1956(a)(2)(A).

The combination of the foregoing requirements means that a plaintiff cannot simply assert by fiat that funds a defendant transferred between accounts were the proceeds of a fraud against the plaintiff.  *See First Capital*, 385 F.3d at 179 (dismissing complaint that "fails to explain either how or when [defendant] received assets" he allegedly sequestered in fraud on creditors).  As *First Capital* illustrates, even if a plaintiff alleges that funds were transferred pursuant to a fraudulent scheme, the plaintiff must show that the funds at issue did not come from some innocent source.  *Id.*  Affirming the dismissal for failure to state a claim, the Second Circuit observed *in First Capital* that "there is nothing in the record to support the allegation that when [defendant's mother] wired monies to [defendant], she was sending him his own assets in an effort to help him conceal them [in furtherance of the alleged bankruptcy fraud], rather than sending him gifts of money like those that she routinely sent" to her children.  *Id.*

Dr. Ayyash's wire fraud allegations fail under these standards.  The only wirings that Dr. Ayyash alleges have any connection with the United States are the three transfers he says Mr. Moawad made in October 2002 from Mr. Moawad's account at UCB to his accounts at European financial institutions, by way of New York correspondent banks.  (Compl. ¶¶ 38-43.) But these transfers cannot be an "incident to an essential part of the scheme" because they allegedly occurred *after* the funds at issue had allegedly been removed from Dr. Ayyash's accounts.  *Altman*, 48 F.3d at 102; *Price*, 2000 U.S. Dist. Lexis 4552, *19-20.  Indeed, Dr. Ayyash has no facts with which to link the three transatlantic wirings to whatever injury Dr. Ayyash may have suffered at the hands of Ms. Koleilat.  Any other wirings to which he may allude in his Complaint were not to, from, or in the United States.

Moreover, Dr. Ayyash's allegation that these funds had been "embezzled" from him is made solely upon "information and belief" (Compl. ¶ 42), with no statement of what that "information" is or the facts upon which its "belief" is founded. This is impermissible under Rule 9(b). As in *First Capital*, Dr. Ayyash does not even attempt to make any factual allegations that the $2,060,000 in wire transfers actually involved ill-gotten funds. The inadequacy of Dr. Ayyash's allegation is especially stark given that Dr. Ayyash owns Al-Madina Bank and UCB (Compl. ¶ 6) and, therefore, more than any other RICO plaintiff, cannot possibly say that the allegation relates to "matters peculiarly within [the] defendant's knowledge." 385 F.3d at 179. Thus, he should not even be making such allegations upon "information and belief."

Dr. Ayyash's money laundering allegations are deficient for exactly the same reasons as his wire fraud allegations. Aside from some insinuations about transfers confined to Arab countries (Compl. ¶¶ 48-51), Dr. Ayyash's money laundering allegations merely rehash his allegations about "the wire transfers described above" (*id.* ¶ 45) in the wire fraud paragraphs.

In short, Dr. Ayyash has yoked Mr. Moawad to the other defendants because he is trying to plead a wire fraud involving the United States in order to attempt to get the benefit of RICO. He has failed to do so, and this Court should not countenance the attempt.

## B. The RICO Claim Should Be Dismissed Because Dr. Ayyash Failed to Plead a Pattern of Racketeering Activity

Dr. Ayyash's RICO claim should also be dismissed because the asserted predicate acts do not have open-ended or close-ended continuity, and therefore there is no pattern of racketeering activity necessary for the RICO claim.

RICO proscribes investing in, maintaining an interest in, or conducting or participating in an enterprise from or through "a pattern of racketeering activity." 18 U.S.C.

§§ 1962(a), (b), (c).[11]  The RICO statute provides that a "pattern" requires "at least two acts of

racketeering activity," 18 U.S.C. § 1961(5), but in *H.J., Inc. v. Northwestern Bell Tel. Co.* the

Supreme Court confirmed that simply proving that a defendant committed two predicate acts is

insufficient to establish that that defendant engaged in a "pattern of racketeering activity," 492

U.S. 229, 239 (1989).  In addition, a RICO plaintiff must prove "that the racketeering predicates

are related, and that they amount to or pose a threat of continued criminal activity."  *Id.* at 239.

This additional proof comprises the two fundamental elements of a RICO pattern of racketeering

activity:  "relatedness" and "continuity."   The "continuity" aspect of a pattern of racketeering

activity may be either "open-ended" or "closed-ended."  *Id.* at 239, 241.

### 1.    Open-Ended Continuity

Open-ended continuity requires "past conduct that by its nature projects into the

future with a threat of repetition."  *H.J. Inc.*, 492 U.S. at 241.  The "threat" necessary for open-

ended continuity exists only where "the racketeering acts themselves include a specific threat of

repetition extending indefinitely into the future" or where "it is shown that the predicates are a

regular way of conducting defendant's ongoing legitimate business."  *Id.* at 242-43.  A plaintiff

cannot establish open-ended continuity when the alleged scheme is "inherently terminable" or

has resulted in the exhaustion of the asset that was the object of the scheme because "defies logic

---

[11]     Plaintiff opens his Complaint by asserting that Defendants violated §§ 1962(b), (c) and
(d) (Compl. ¶ 1), but he has failed completely to plead any § 1962(b) claim and, in fact, makes
no other reference to § 1962(b).  Section 1962(b) prohibits "any person through a pattern of
racketeering activity . . . to acquire or maintain, directly or indirectly, any interest in or control of
any enterprise."  A plaintiff under § 1962(b) must allege an "acquisition injury," which is an
injury from the defendant's acquisition of that interest in the RICO enterprise, and which must be
distinct from the injuries resulting from the predicate acts themselves.  *See Discon, Inc. v.
NYNEX Corp.*, 93 F.3d 1055, 1064 (2d Cir. 1996), *vacated on other grounds*, 525 U.S. 128
(1998).  Dr. Ayyash does not even allege a distinct "acquisition injury," as his First Count (his
only substantive RICO count) attempts merely to assert only injuries from the predicate acts.
(Compl. ¶¶ 61-76.)

to suggest that a threat of continued looting activity exists when, as plaintiff admits, there is nothing left to loot." *First Capital*, 385 F.3d at 180 (2d Cir. 2004) (quoting *GICC Capital Corp. v. Tech. Fin. Group*, 67 F.3d 463, 466 (2d Cir. 1995)). *Accord Linens of Europe, Inc. v. Best Mfg., Inc.*, 2004 WL 2071689, at *17 (S.D.N.Y. Sept. 16, 2004) (Lynch, J.); *Vicon Fiber Optics Corp. v. Scrivo*, 201 F. Supp. 2d 216, 221 (S.D.N.Y. 2002) (McMahon, J.); *Pier Connection, Inc. v. Lakhani*, 907 F. Supp. 72, 75-77 (S.D.N.Y. 1995) (Scheindlin, J.).

Here, there is no open-ended continuity on the face of Dr. Ayyash's allegations. He alleges that defendants' "scheme . . . continued until the Bank and UCB collapsed in February 2003." (Compl. ¶ 5.) Dr. Ayyash speculates that, but for the bank scandal, "defendants would have likely continued their scheme" (*id.*), but speculation does not trump reality. Dr. Ayyash's numerous allegations that the scheme continued until it caused the Banks to collapse (*id.* ¶¶ 19, 53, 54) establish conclusively that the alleged scheme was inherently terminable, and thus he has not satisfied and cannot satisfy the requirements for open-ended continuity.

## 2.        Close-Ended Continuity

Nor can Dr. Ayyash establish close-ended continuity because he has asserted only a few predicate acts that span only a few months and establish at most a single scheme directed at a single victim.

Closed-ended continuity requires proof of "a series of related predicates extending over a substantial period of time." *H.J., Inc.*, 492 U.S. at 242. The existence of closed-ended continuity depends on factors such as the length of time over which the acts unfolded, the number and variety of the acts, the number of participants, the number of victims, and the presence of separate schemes. *GICC*, 67 F.3d at 467. The Second Circuit "has never found a close-ended pattern where the predicate acts spanned fewer than two years." *First Capital*, 385

F.3d at 181 (dismissing RICO claim where 2.5 years elapsed between first and last predicate).

*See Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999) (same,

1.5 years); *GICC*, 67 F.3d at 466-68 (same, two years); *Rampersad v. Deutsche Bank Secs., Inc.*,

2004 WL 616132 (S.D.N.Y. Mar. 30, 2004) (Swain, J.) (one year); *Vicon*, 201 F. Supp. 2d at 221

(two years); *Pier Connection*, 907 F. Supp. at 77-78 (ten months).  Predicates not sufficiently

pled cannot extend the duration of a RICO pattern or otherwise count in substantiating a pattern.

*See, e.g.*, *Powers v. British Vita, P.L.C.*, 57 F.3d 176, 190 (2d Cir. 1995) (remanding to

determine if pattern exists based on predicates pled with particularity).  Naturally, conduct not

alleged to constitute a predicate act also cannot increase the length or the number of predicate

acts in a RICO pattern.

   Moreover, even if the duration of the scheme were not dispositive, courts

routinely dismiss single-scheme, single-victim RICO claims based on only a few predicate acts.

*See, e.g.*, *First Capital*, 385 F.3d at 182 (allegations of a single scheme to defraud two creditors

through several fraudulent conveyances did not constitute a RICO pattern); *Weizmann Inst. of*

*Sci. v. Neschis*, 229 F. Supp. 2d 234, 256-57 (S.D.N.Y. 2002) (single scheme, two victims, four

predicates, no pattern); *Vicon*, 201 F.Supp. 2d at 221 (single scheme, one victim, two predicates

in two years, no pattern); *Feirstein v. Nanbar Realty Corp.*, 963 F. Supp. 254, 260 (S.D.N.Y.

1997) (Batts, J.) (four predicates in three years to cheat one victim insufficient); *Thai Airways*

*Int'l Ltd. v. United Aviation Leasing B.V.*, 891 F. Supp. 113, 119 (S.D.N.Y. 1994) (Mukasey, J.)

(after screening out the predicates that were not pled with particularity, court found "few

criminal acts and a short-lived scheme" and dismissed), *aff'd*, 59 F.3d 20 (2d Cir. 1995); *Airlines*

*Reporting Corp. v. Aero Voyagers, Inc.*, 721 F. Supp. 579, 584 (S.D.N.Y. 1989) (Sweet, J.)

(single scheme, three participants, one victim, fifty-two weekly mailings of allegedly fraudulent financial reports, no pattern).

Although Dr. Ayyash asserts in conclusory fashion that the "scheme began at least in or about November 1999, and continued until the Bank and UCB collapsed in February 2003" (Compl. ¶ 5), this apparently just means that any time Dr. Ayyash deposited funds into his account 69911 at Al-Madina Bank defendants *ipso facto* must have somehow committed a crime against him. Dr. Ayyash has made *absolutely no* factual allegations about acts pursuant to the scheme prior to the three wire transfers by Mr. Moawad which allegedly occurred between October 15 and 21, 2002 (*id.* ¶¶ 39-41), and which were *followed* by the "first . . . forgery" by Ms. Koleilat on November 4, 2002 (*id.* ¶ 29). *All* of the alleged predicate acts occurred within the four-month window between the first wire transfer and the Banks' collapse. Under Second Circuit precedent, this is nearly two years too short.

Dr. Ayyash's asserted RICO claim also lacks the other indicia of close-ended continuity. Despite generalizations about the impact of the alleged scheme on other investors, Dr. Ayyash has identified no other victims of the alleged fraud, and he manifestly alleges conduct directed solely at him, consisting of forgeries designed to induce only him to transfer funds into his own account at his bank, combined with the diversion of those funds by some unstated means. (*Id.* ¶¶ 27-37, 53-60.) The forgeries, which are the only fraudulent acts alleged with any attempt at particularity, are quite few in number, totaling only three. (*Id.* ¶¶ 29, 33-34.)

In sum, apart from its extreme brevity, this is a typical single-scheme, single-victim attempted RICO claim based on only a handful of predicates. It should be dismissed.

### C.   THE RICO CONSPIRACY CLAIM SHOULD BE DISMISSED

Section 1962(d) provides that it is a violation of RICO to conspire to violate a substantive provision of § 1962. Such RICO conspiracy claims necessarily fail if the asserted

underlying activity cannot or does not constitute a substantive RICO violation.  *First Capital*, 385 F.3d at 182; *Discon*, 93 F.3d at 1064 (2d Cir. 1996).  Because Dr. Ayyash's claim under § 1962(c) fails, so too does his RICO conspiracy claim.

      **D.**      **THE FRAUD CLAIM SHOULD BE DISMISSED**

      This Court has jurisdiction over this action based solely on Dr. Ayyash's assertion of federal RICO claims.  There is no diversity jurisdiction in this action with exclusively foreign parties, nor is diversity jurisdiction pled.  With the dismissal of the RICO claims for the multiple reasons set out above, this Court can and should decline to exercise supplemental jurisdiction over the remaining Lebanese-law claims, including Count III, which is the only other claim asserted against Mr. Moawad.  28 U.S.C. § 1367(a); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) (when "all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims").

## <u>CONCLUSION</u>

For all of the foregoing reasons, the Court should grant Mr. Moawad's motion and dismiss the Complaint.

August 1, 2005

PROSKAUER ROSE LLP

By:   <u>/s/ Peter J.W. Sherwin</u>
       Bradley I. Ruskin (BR 8489)
       Peter J.W. Sherwin (PS 3639)
       Matthew J. Morris (MM 5179)

       1585 Broadway
       New York, NY 10036-8299
       Tel.: (212) 969-3000

       *Attorneys for defendant*
       René Moawad