UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
          :
ADNAN ABOU AYYASH,            :
          :
        Plaintiff,          :
          :      04 Civ. 9201 (GEL)
    -v-          :
          :      **OPINION AND ORDER**
BANK AL-MADINA, UNITED CREDIT BANK,  :
RANA ABDELRAHIM KOLEILAT, TAHA       :
ABDELRAHIM KOLEILAT, BASSEL             :
ABDELRAHIM KOLEILAT, RENE MOAWAD,  :
JOUMANA MOHAMAD AYYAS, and JOHN    :
DOES 1-10,                                   :
          :
        Defendants.          :
          :
------------------------------------------------------------x

Daniel H. Weiner, Hughes Hubbard and Reed LLP, New York, NY (David G. Liston and Michael D. Tiger, on the brief), <u>for plaintiff</u>.

Bradley I. Ruskin, Proskauer Rose LLP, New York, NY (Peter J.W. Sherwin and Matthew J. Morris, on the brief), <u>for defendant Rene Moawad</u>.

GERARD E. LYNCH, <u>District Judge</u>:

      Plaintiff Adnan Abu Ayyash brings this action against various Lebanese entities and individuals, claiming that through a scheme to defraud masterminded by defendant Rana Koleilat, defendants stole and laundered through the United States and other countries more than one billion dollars belonging to Ayyash, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964(c), and New York law. Defendant Rene Moawad now moves to dismiss the complaint for lack of subject matter jurisdiction, Fed. R. Civ. P. 12(b)(1), lack of personal jurisdiction, <u>id</u>. 12(b)(2), improper venue on the basis of forum non conveniens, <u>id</u>. 12(b)(5), and as to the RICO claims, failure to state an actionable claim, <u>id</u>.

12(b)(6). For the following reasons, Moawad's motion will be dismissed, without prejudice to refiling after limited jurisdictional discovery.

## BACKGROUND

Ayyash, a Lebanese national currently residing in Saudi Arabia and with no personal or professional ties to the United States, is the majority owner of two banks in Lebanon, Al-Madina Bank ("Madina") and its affiliate, United Credit Bank ("UCB") (collectively "the Banks"). (Compl. ¶¶ 6-8.) Ayyash alleges that defendants, all Lebanese nationals employed by or associated with the Banks, conspired "to acquire control and conduct the affairs" of the Banks through a pattern of racketeering activity "including wire fraud, money laundering, forgery and embezzlement," primarily for the purpose of enriching themselves. (Id. ¶¶ 3-4, 47-51.) This conspiracy was masterminded by defendant Rana Abdelrahim Koleilat, officer and advisor to the General Manager of Madina, and involved a number of Koleilat's family members and fellow bank employees, including defendant Moawad, who is alleged to be Koleilat's boyfriend. (Id. ¶¶ 1, 12.) The conspiracy existed from November 1999 to February 2003, until "[d]efendants and their corrupt enterprise" caused the Banks' collapse (id. ¶¶ 5, 53), resulting in "one of the largest scandals in modern Lebanese history" (Pl. Mem. at 6).[1]

The mechanics of defendants' conspiracy are somewhat hazy, but it is alleged that Rana, a high-level Madina employee with "unfettered access to all financial and operational

---

[1] Ayyash alleges that defendants used certain of the proceeds of the fraud to "provide material support to international terrorist organizations." He specifically alleges that Rana paid $3.5 million to "'Al-Shaheed,' a front organization for Hezbollah, the well-known terrorist organization." (Compl. ¶ 48.) Ayyash also claims that "Rana and other members of the conspiracy" laundered money though Madina for the benefit of the Central Bank of Iraq, which was allegedly operating contrary to accepted banking practices. (Id. ¶¶ 49-52.)

2

information" at the bank, engaged, with the assistance of others, in a series of forgeries that induced Ayyash to transfer approximately $670 million into the bank, funds which Koleilat then siphoned to herself and her co-conspirators. (Id. ¶¶ 23-24, 27-37.) Ayyash transferred these funds to what he believed was his personal account at Madina, but which was actually a "dummy" account set up by Koleilat. (Id. ¶¶ 29-31.) These funds were transferred from the dummy account to defendants' personal accounts at the Banks, and then to accounts "around the world," in order "to segregate [the funds] further from Al-Madina Bank and UCB." (Id. ¶ 46.)

Significant for the present motion, Ayyash claims that among these international transfers were wires "through and to accounts in the United States" of funds stolen by defendants, transfers intended to "promote the carrying on of unlawful activity, *i.e.*, the defrauding of the foreign banks Al-Madina Bank and UCB" (id. ¶¶ 38, 42, 45). The complaint and an investigative consultant's declaration submitted by Ayyash specifically discuss four such wire transfers:

- On or about October 15, 2002, a $1 million transfer from Moawad's UCB account to his account with Banque Safra France, which allegedly was routed through Wachovia Bank in New York and UBS AG in Stamford, Connecticut. (Id. ¶ 39; McLaughlin Decl. ¶ 5.) It is unclear whether the funds were ultimately transferred to France or "remained in the United States in an account of or at a branch of Banque Safra France." (McLaughlin Decl. ¶ 6.)

- On or about October 18, 2002, a $500,000 transfer from Moawad's UCB account to his account at EDF Man International, Inc., a London-based bank, through Wachovia Bank in New York. (Compl. ¶ 40.) While not entirely clear, the consultant claims that "the available documentation indicates that the transaction terminated in the United States at EDF Man's Chase Manhattan Bank account [in New York] held on Moawad's behalf." (McLaughlin Decl. ¶ 8.)

- On or about November 20, 2002, a $560,000 transfer from Moawad's UCB account to his account with Ferrier Lullin N Cie SA, a Swiss bank, through Wachovia NA, New York to an account at UBS AG in Stamford held by Ferrier Lullin. (Compl. ¶ 41; McLaughlin Decl. ¶ 9.) Ayyash's consultant claims that

3

> "the available documentation indicates that the transaction terminated in the United States at Ferrier Lullin's [UBS] account." (McLaughlin Decl. ¶ 10.)
>
> • On January 29, 2003, a $1 million transfer from Moawad's UCB account, through Wachovia Bank in New York, to an account held by the Bank of Beirut for the benefit and credit of Moawad. Ayyash's consultant states that "[b]ased on the available documentation, the funds could have remained in the United States in an account of the Bank of Beirut." (McLaughlin Decl. ¶¶ 11-12.)

As to all these transactions, Ayyash's consultant would need "further documentation" to "definitively conclude" where the transactions terminated. (Id.)

Ayyash's expert also states that during this period (October 2002-February 2003), Moawad's UCB account was receiving large deposits from other accounts at Madina and UCB, including four transfers from December 2002 to February 2003 from Koleilat's UCB and Madina accounts totaling approximately $20 million (Id. ¶¶ 16-26.) As with the other transactions discussed by Ayyash's expert, "[b]ased on the current record, it is unclear whether these statements reflect the entire transactions or whether these transactions originated or terminated in locations or accounts not reflected on the documents." (Id. ¶ 26.)

Ayyash alleges that the conspiracy led ultimately to the Banks' collapse. Specifically, Koleilat triggered a liquidity crisis at the Banks by issuing more than $150 million in checks in her and her co-conspirators' names between December 2002 and January 2003, "in an attempt to withdraw the remaining balance of suspected laundered money from Al-Madina Bank and UCB." (Id. ¶¶ 53-54.) Ayyash attempted to avert this crisis by infusing the Banks with $470 million of his own funds; the attempt was unsuccessful and Ayyash never recovered these funds. (Id. ¶ 55.)

Ayyash attempted through a number of means to recover the more than $1 billion he lost, without success. First, Ayyash contacted Koleilat and threatened to sue her if she did not return

4

his money. Koleilat convinced Ayyash that she would pay him back by transferring to him a $4 billion account she held in a Swiss bank, if Ayyash would give Koleilat a check to cover the amount in the account over what she owed him. (Id. ¶ 58.) Ayyash complied and made out checks to Koleilat, only to later discover that the bank account did not exist. Koleilat used Ayyash's checks to pay off some of her own debts, in particular providing the Central Bank with check for 310 million euros drawn on the Arab Bank in Paris. (Id. ¶ 60.)

Ayyash has also attempted to bring suit against Koleilat and her co-conspirators in Lebanon, but he alleges that these suits have been thwarted by the Lebanese courts and Central Bank, which allegedly are subject to pressure from "high-level officials" who may have participated in the conspiracy. (Pl. Mem. at 38-40; Def. Mem. at 27-28; Sardouk Decl. ¶¶ 10-23.) In fact, instead of taking action against Koleilat and her cohorts, Ayyash alleges that the Lebanese government has (wrongly) brought suit against *Ayyash* in connection with the Banks' collapse. (Pl. Mem. at 38-40.)

Ayyash subsequently commenced this action against numerous defendants, including the Banks themselves, Rana Koleilat, three of Koleilat's family members, Moawad, and ten unnamed Doe defendants – presumably Bank employees who participated in the conspiracy – asserting RICO and state common-law claims against some or all of the defendants in connection with the alleged fraud and money laundering at the Banks. Since the filing of the complaint, Ayyash has voluntarily dismissed the complaint as to the Banks, and the Court dismissed the complaint as to Koleilat without prejudice on February 27, 2006, Ayyash having been unable to locate her and serve her with process. Moawad is the only remaining defendant who has entered an appearance in this case, and he now moves to dismiss the complaint as to him primarily on

5

procedural grounds, arguing that neither he nor the alleged conspiracy at issue has sufficient ties to the United States for this Court to exercise jurisdiction, and that in any case, Lebanon, and not the United States, is the proper forum to address this controversy.

**DISCUSSION**

Moawad moves to dismiss on four grounds, lack of subject matter jurisdiction, lack of personal jurisdiction, improper forum, and failure to state an actionable claim under RICO. Those arguments will be addressed in turn.

I.    Subject-Matter and Personal Jurisdiction

On a motion to dismiss for lack of subject-matter or personal jurisdiction, the plaintiff bears the burden of persuasion. See Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 507 (2d Cir. 1994). The nature of the plaintiff's burden

> varies depending on the procedural posture of the litigation. Prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, see Fed. R. Civ. P. 11, legally sufficient allegations of jurisdiction. At that preliminary stage, the plaintiff's prima facie showing may be established solely by allegations. After discovery, the plaintiff's prima facie showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant. . . . At that point, the prima facie showing must be factually supported.

Ball v. Metallurgie Hoboken-Overpelt, S.A., 902 F.2d 194, 197 (2d Cir. 1990) (emphases omitted). Because the parties have not conducted discovery, the question is whether Ayyash's allegations and the supporting materials, taken in the light most favorable to Ayyash, make out a prima facie showing, that is, "legally sufficient allegations of jurisdiction." Robinson, 21 F.3d at 507; Ball, 902 F.2d at 197. The relevant jurisdictional standards overlap, and focus on the contacts between this dispute, Moawad, and the United States, and the materiality of those

6

contacts to the alleged conspiracy.

First, as to subject-matter jurisdiction under RICO, the Second Circuit has held that while foreign entities are not, due to their foreign status alone, shielded from RICO's reach, the statute's extraterritorial application is limited. North-South Fin. Corp. v. Al-Turki, 100 F.3d 1046, 1052 (2d Cir. 1996).[2] In Al-Turki, the court discussed two tests (one of which must be met) that can be used to determine whether that limit is satisfied: the "conduct" and "effects" tests. See id. at 1052.[3] The conduct test, on which Ayyash relies here, requires that "conduct

---

[2] In a line of cases ending with Al-Turki, the Court of Appeals characterized the limit on RICO's extraterritorial application as a constraint on courts' "subject-matter jurisdiction." 100 F.3d at 1051; accord Alfadda v. Fenn, 935 F.2d 475, 479 (2d Cir. 1991). However, the Supreme Court has recently cautioned against the "profligate" use of jurisdictional terminology when discussing potential defects in a plaintiff's claim, and highlighted specifically the tendency of courts to term the non-existence of a critical fact a "jurisdictional defect" rather than merely the failure to prove an element of the claim – so called "drive-by jurisdictional rulings." Arbaugh v. Y & H Corp., — U.S. —, — S. Ct. —, 2006 WL 397863, at *6-*9 (Feb. 22, 2006). As noted by the Arbaugh Court, such imprecision has significant consequences. Unlike merits challenges, challenges to a court's subject matter jurisdiction cannot be waived and can be raised even after trial has concluded and judgment has been entered. Id. Moreover, factual disputes as to jurisdictional questions are typically resolved by the judge in a pre-trial hearing, not by a jury at trial. For that reason, the Supreme Court held in Arbaugh that "when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character." 2006 WL 397863, at *8. In this case, the RICO statute is silent about its extraterritorial effect, id., and thus does not indicate whether the required "nexus" to the United States is simply an element of a RICO claim or a jurisdictional constraint.

The Supreme Court's decision in Arbaugh may require that the Court of Appeals review its treatment of the question of RICO's extraterritorial effect. However, in this case neither party challenges the characterization of the issue as jurisdictional in nature, and this Court is any event bound by the Court of Appeals' decisions until such time as they are directly overruled by that court or the Supreme Court.

[3] The Al-Turki court recognized that the application to RICO of these tests, drawn from the securities and antitrust contexts, may be inappropriate, stating "[we] do not assume that congressional intent in enacting RICO justifies a similar approach to the statute's foreign application." 100 F.3d at 1052. The Court nevertheless applied those tests because, as in this case, the parties assumed that those tests were applicable. Id. To date no other test has been proposed.

7

that is both material to the completion of the fraud" and directly caused the alleged injury have occurred in the United States. Id.[4]

As to personal jurisdiction over Moawad, Ayyash points to two sources of authority. First, New York's long-arm statute, N.Y.C.P.L.R. § 302(a)(1), which requires that Moawad have "purposely availed" himself of the benefits and protections of New York law, through business contacts with New York that are neither "random" nor "fortuitous," and can be said to have "provide[d] [Moawad] with notice that [he] might be subjected to suit in courts of [New York]." Bozell Group, Inc. v. Carpet Co-op of Am. Assoc., No. 00 Civ. 1248, 2000 WL 1523282, at * 6-*7 (S.D.N.Y. Oct. 11, 2000). Those contacts must also bear a "substantial nexus" to Ayyash's claims. Id. Second, Fed. R. Civ. P. (4)(k)(2) would provide for jurisdiction over Moawad if he (1) were not subject to jurisdiction under New York law and (2) had "sufficient contacts with the United States, as a whole . . . to satisfy the requirements of the due process clause of the Fifth Amendment." Daventree Ltd. v. Rep. of Azerbaijan, 349 F. Supp. 2d 736, 760 (S.D.N.Y. 2004). Similar to New York's long-arm statute, the Due Process Clause requires both that Moawad have "purposely availed" himself of the benefits and protections of the laws of the United States and that Ayyash's RICO claims "arise[] out of or relate[] to [Moawad's] contacts." Id. Further, the Due Process Clause requires the court to determine whether it would be "reasonable" to assert jurisdiction over Moawad, looking to a number of factors including "the burden that the exercise of jurisdiction will impose on [him]" and "the interests of [the United States] in

---

[4] The effects test requires that the fraud itself have had a substantial effect on the United States. Id. While Ayyash does not advance the effects test as a basis for jurisdiction, he purports to reserve the right to make such an argument "should discovery uncover additional information demonstrating that defendants' scheme affected domestic individuals or institutions." (Pl. Mem. at 13 n.5.)

adjudicating the case." Id. at 762 (quotation omitted).[5]

At first glance, the jurisdictional nexus between this Lebanese controversy and the United States seems dubious. However, the complaint and supporting materials assert that as a part of defendants' conspiracy to defraud the depositors of Madina and UCB, and "with the intent to promote . . . the defrauding of the foreign banks Al-Madina Bank and UCB" (Compl. ¶ 45), Moawad "ordered" the wire transfer of more than $3 million dollars to bank accounts abroad, that these funds were routed through United States banks, and that at least some (and possibly all) of these funds were ultimately deposited in United States bank accounts held on Moawad's behalf. (Id. ¶¶ 39-41.) Around the time that Moawad executed these transfers, there was a substantial influx of funds into Moawad's UCB bank account, including approximately $20 million from Rana Koleilat, the alleged mastermind of the fraud on the Banks. It is further alleged that these transfers "are representative of similar transactions used by defendants to carry out their scheme of wire fraud, money laundering, forgery, credit card fraud and embezzlement" (id. ¶ 43),[6] and that these international wire transfers were designed to "segregate" or distance

---

[5] C.P.L.R. § 302(a)(1) and Fed. R. Civ. P. 4(k)(2) are the only provisions discussed in Ayyash's motion papers. (Pl. Mem. at 26-29.)

[6] Moawad argues (in passing) that this Court may not credit those allegations regarding the American transactions and the relationship of those transactions to defendants' fraud, that are pleaded "on information and belief," citing Campaniello Imports, Ltd. v. Saporiti Italia S.p.A., 117 F.3d 655, 664 (2d Cir. 1997) (holding fraud allegations may not be pleaded "on information and belief" except when subject matter is peculiarly within defendants' knowledge). (Def. Mem. at 16-17.) Ayyash responds, convincingly, that the details of Moawad's transactions and defendants' conspiracy are peculiarly within their knowledge, and that, to the extent necessary, he has provided numerous detailed factual allegations regarding that conspiracy to base any pleading made on "information and belief." (Pl. Mem. at 19.) In any event, Moawad has apparently abandoned this argument as he fails to respond to Ayyash's contentions in his reply brief.

funds from Madina and UCB (id. ¶ 46).

Moawad attempts to minimize the significance of the wire transfers (at least those he allegedly ordered), denying that he has directly conducted any business or been involved in any commercial transaction in the United States, denying that he maintains any bank accounts in the United States, and stating that he was unaware that the transfers discussed in the complaint were routed through the United States. (Moawad Decl. ¶¶ 4-8.) But in addition to evidence that two separate accounts were held "on Moawad's behalf" in the United States (McLaughlin Decl. ¶¶ 8, 11-12), Ayyash has produced a letter dated February 20, 2003, from Moawad to Ayyash, in which Moawad, in connection with a contemplated purchase of a Czech hotel, specifically requests that Ayyash deposit $28 million into the Connecticut-based Ferrier Lullin account that was allegedly held on Moawad's behalf and used in perpetrating defendants' conspiracy. (Tiger Decl. Ex. Q; McLaughlin Decl. ¶ 9.)

Ayyash primarily argues that whether or not the allegations and evidence produced at this stage constitute a prima facie showing of subject-matter and personal jurisdiction, they are enough to warrant limited jurisdictional discovery to further explore the connections between Moawad, the alleged fraud conspiracy, and the United States. "District courts have considerable discretion in determining how best to handle jurisdictional questions," Best Van Lines, Inc. v. Walker, No. 03 Civ. 6585, 2004 WL 9642009, at *3 (S.D.N.Y. May 5, 2004), citing CutCo Indus. v. Naughton, 806 F.2d 361, 364-65 (2d Cir. 1986), and "generally" may permit a plaintiff to conduct "limited discovery with respect to the jurisdictional issue." Filius v. Lot Polish Airlines, 907 F.2d 1328, 1332 (2d Cir. 1990); see also APWU v. Potter, 343 F.3d 619, 627 (2d Cir. 2003) (cautioning that "a court should take care to give the plaintiff ample opportunity to

10

secure and present evidence relevant to the existence of jurisdiction" (quoting Phoenix Consulting, Inc. v. Republic of Angola, 216 F.3d 36, 40 (D.C. Cir. 2000)). Such discovery has typically been authorized where the plaintiff has made "a threshold showing that there is some basis for the assertion of jurisdiction[,] facts that would support a colorable claim of jurisdiction." Daval Steel Prods. v. M.V. Juraj Dalmatinac, 718 F. Supp. 159, 162 (S.D.N.Y. 1989); see also Strategem Dev. Corp. v. Heron Int'l N.V., 153 F.R.D. 535, 547-48 (S.D.N.Y. 1994) (authorizing jurisdictional discovery where plaintiff "made a sufficient start" toward establishing jurisdiction, though not a prima facie showing).[7]

Ayyash has made a sufficient showing to warrant such jurisdictional discovery. As to subject-matter jurisdiction under RICO, while the Second Circuit has indicated that jurisdiction is "not necessarily" supported where "a scheme . . . is linked solely to the United States by alleged predicate acts of . . . wire fraud," Al-Turki, 100 F.3d at 1052, and has held that the conduct test is not satisfied where the transfer of funds into or out of the United States is merely

---

[7] Moawad contends that Ayyash must make a prima facie showing of jurisdiction before this Court may authorize jurisdictional discovery, relying on Jazini v. Nissan Motor Corporation, 148 F.3d 181 (2d Cir. 1998). That reliance is misplaced. In Jazini, the Court held only that the district court in that case did not abuse its discretion by denying jurisdictional discovery where the plaintiff failed to make a prima facie showing, not that a district court may never do so. Moreover, in making its ruling, the Jazini court focused on the paucity of the factual allegations in that plaintiff's complaint, as well as the unique policies at work when foreign parent corporations are sued on the basis of the presence of their subsidiaries in the United States. Id. at 185-86. Jazini did not purport to lay down a categorical rule, a fact that has since been recognized by a Second Circuit panel. See Texas Int'l Magnetics, Inc. v. BASF Aktiengesellschaft, 31 Fed. Appx. 738, 739 (2d Cir. 2002) (unpublished); see also In re Magnetic Audiotape Antitrust Litig., 334 F.3d 204, 28 (2d Cir. 2003) (authorizing jurisdictional discovery where allegations constituted "arguable" jurisdictional basis, so plaintiff could develop facts in support of prima facie showing). Indeed, such a categorical rule would seem to conflict with the plain language of Fed. R. Civ. P. 12(d), which authorizes a district court to hold in abeyance a motion to dismiss for lack of subject-matter or personal jurisdiction "until . . . trial."

11

incidental, "preparatory," or "peripheral" to the principal fraud, id. at 1048, 1053 (no jurisdiction where wire transfers were merely preparatory for fraud wholly perpetrated overseas), courts have held the jurisdictional requirement satisfied where a wire transfer into or from the United States is integral to the fraud. See Madanes v Madanes, 981 F. Supp. 241, 251 (S.D.N.Y. 1997) (subject-matter jurisdiction where wire transfers were integral to fraud because they served to hide assets from plaintiff); United States v. Approx. $25,829,681.80, No. 98 Civ. 2682, 1999 WL 1080370, at *4 & n.2 (S.D.N.Y. Nov. 30, 1999) (noting subject-matter jurisdiction under conduct test where tainted foreign funds were transferred through New York account, where transfers constituted underlying RICO predicates); see also Bank of Crete, S.A. v. Koskotas, No. 88 Civ. 8412, 1991 WL 177287, at *6 (S.D.N.Y. Aug. 30, 1991) (jurisdiction where defendant transferred funds from plaintiff's U.S. bank account to defendant's U.S. account for personal use). In this case, the complaint alleges that wire transfers through and to the U.S., which constitute the wire-fraud and money laundering predicates underlying the RICO claims, were similarly integral to defendants' conspiracy. The complaint alleges generally that Moawad's transfers (and other similar transfers) were intended to promote the carrying on of the fraud on the Banks (Compl. ¶ 45), and specifically that the international transfers of funds were used to "segregate" or distance the stolen funds from Madina and UCB (id.¶ 46), presumably to make it more difficult for those funds to be located and returned to the victimized depositors.

Assuming arguendo that these allegations do not constitute a prima facie showing of subject-matter jurisdiction, they at least constitute a "sufficient start" at making such a showing. Strategem Dev. Corp., 153 F.R.D. at 547-48. Moreover, Ayyash claims that jurisdictional discovery may provide further evidence on a number of different fronts, including, clarifying the

12

nature of the four U.S. transactions that have already been identified, identifying additional U.S. transactions in which Moawad was involved (and specifically, establishing Moawad's involvement with Madina's and UCB's U.S. accounts, which were "open and extremely active" at the time of defendants' conspiracy (Pl. Mem. at 24)), and helping to clarify the relationship between these transactions and the alleged conspiracy. For these reasons, the Court declines to rule on the issue of subject-matter jurisdiction until such discovery has occurred. For essentially the same reasons, a ruling as to personal jurisdiction at this time would also be premature.

II.     Forum Non Conveniens

While the Court declines to rule as to jurisdiction, it may nonetheless address Moawad's argument that it should, as a matter of discretion, dismiss this action on forum non conveniens grounds because Lebanon is a more appropriate forum for this case to go forward. See Grace v. Rosenstock, 228 F.3d 40, 55-56 (2d Cir. 2000); Saferstein v. Paul, Mardinly, Durham, James, Flandreau & Rodger, P.C., 927 F. Supp. 731, 735 (S.D.N.Y. 1996).

Forum non conveniens is a tool granted to courts so that they may, at their discretion, "resist imposition upon [their] jurisdiction even when jurisdiction is authorized by the letter of a general venue statute." Gulf Oil Corp. v Gilbert, 330 U.S. 501, 507 (1947). Although the district courts are accorded broad discretion to dismiss a case on forum non conveniens grounds, the Second Circuit has adopted a three-step inquiry to guide the exercise of that discretion:

> At step one, a court determines the degree of deference properly accorded the plaintiff's choice of forum. At step two, it considers whether the alternative forum proposed by the defendants is adequate to adjudicate the parties' dispute. Finally, at step three, a court balances the private and public interests implicated in the choice of forum.

Norex Petroleum, Ltd. v. Access Indus., 416 F.3d 146, 153 (2d Cir. 2005). "Any review of a

forum non conveniens motion starts with 'a strong presumption in favor of the plaintiff's choice of forum.'" Id. at 154, quoting Piper Aircraft Co. v. Reyno, 454 U.S. 235, 255 (1981). "Indeed, it is generally understood that, 'unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed,'" id., quoting Gulf Oil Corp. v. Gilbert, 330 U.S. at 508, although the degree of deference to the plaintiff's choice of forum can vary depending on the circumstances, e.g., whether the United States is the plaintiff's home forum or not, and whether the choice of the U.S. forum was made for legitimate or "forum-shopping" reasons. Iragorri v. United Techs. Corp., 274 F.3d 65, 72 (2d Cir. 2001) (in banc).

Moawad contends, in essence, that litigation of this matter in the United States is inappropriate because (1) the plaintiff and defendants are Lebanese nationals, none of whom resides in the United States, and the plaintiff has no personal or professional ties to the United States; (2) at issue is alleged fraud and money laundering at two Lebanese banks, conduct which plaintiff does not allege has had any impact on the United States or any American individuals or entities; (3) if this case were to go to trial, the parties and the critical third-party witnesses and evidence all exist in Saudi Arabia and Lebanon, not in the United States; and (4) the adequacy of Lebanon as an alternative forum is confirmed not only by prior caselaw, but by the fact that Ayyash himself has commenced litigation in Lebanon against these very defendants. There is thus some force to defendants' argument that the sole reason Ayyash commenced this action in the United States is for the treble damages that are available for private civil actions brought under the RICO banner, and that this case should consequently be dismissed on forum non conveniens grounds. (Def. Mem. at 1, 33-42; Reply at 13-19.)

On the other hand, Ayyash argues that even if Lebanon were an otherwise adequate forum, recent political turmoil in Lebanon has rendered the Lebanese courts and Central Bank "subject to political control." In this "volatile atmosphere," the litigation of high-profile and politically-charged cases such as this one is compromised, a point bolstered by the alleged inaction and obstructive conduct of the Lebanese courts and Central Bank in connection with Ayyash's Lebanese actions. (Pl. Mem. at 35, 37-40.) Further, Ayyash claims that as part of the fraud conspiracy, funds belonging to Ayyash and other depositors of the Banks were transferred to the United States, Iraq, Switzerland, and France, and that "Dr. Ayyash may need to depose individuals and seek production of documents in these institutions' home countries, discovery that Dr. Ayyash may undertake in this Court" (id. at 35), but presumably not in Lebanon. Finally, Ayyash contends that there is a material connection between the United States and defendants' conspiracy, namely Moawad's wire transfers through and to United States banks, and that jurisdictional discovery may provide additional evidence of U.S. contacts and the relationship between those contacts and defendants' fraud.

At this stage, the Court declines to decide which of the parties' accounts should drive the forum non conveniens inquiry. As noted above, Ayyash is entitled to limited jurisdictional discovery to explore the connections between Moawad, the United States, and defendants' fraud. A fuller understanding of these connections is also relevant to the forum non conveniens analysis, and will aid the Court in determining the extent to which events and evidence in the United States are implicated in the dispute, and thus the level of deference to be accorded to Ayyash's choice of forum. See Iragorri, 274 F.3d at 71 ("The more it appears that a domestic or foreign plaintiff's choice of forum has been dictated by reasons that the law recognizes as valid,

15

the greater the deference that will be given to the plaintiff's forum choice").

III. Merits

Finally, Moawad moves to dismiss the RICO claims against him for failure to state a claim upon which relief may be granted. See Rule 12(b)(6). (Def. Mem. at 34-43.) Because the Court has not yet determined whether it may exercise jurisdiction over Moawad or the claims at issue in this case, consideration of the merits at this juncture would be premature. See Arrowsmith v. United Press Int'l, 320 F.2d 219, 221 (2d Cir. 1963) (in banc).

IV. Limited Jurisdictional Discovery

For the foregoing reasons, the Court will permit Ayyash to conduct jurisdictional discovery before ruling on Moawad's objections. That discovery will be limited to the following issues, suggested by Ayyash in his motion papers (Pl. Mem. at 23-25):

- The four U.S. transactions identified in the complaint and supporting declaration.

- Moawad's business contacts in the United States, including his use or maintenance of U.S. bank accounts and his use of or involvement with Madina's and UCB's U.S. accounts, at the time of the alleged conspiracy.

- Activity in Moawad's Madina and UCB accounts at the time of the conspiracy, including the transfers into those accounts (by Rana Koleilat and unknown individuals) identified by Ayyash's investigative consultant. (McLaughlin Decl. ¶¶ 16-25).

Following this discovery, Moawad may re-assert his challenges to the Court's jurisdiction and the propriety of venue (and, of course, as to the merits).

**CONCLUSION**

For the foregoing reasons, Moawad's motion to dismiss is denied, without prejudice to refiling upon the completion of limited jurisdictional discovery. The parties shall appear before the Court for a case management conference on Friday, March 17, 2006, at 3:00 p.m.

16

SO ORDERED.

Dated: New York, New York
      March 9, 2006

                                                GERARD E. LYNCH
                                            United States District Judge